IN THE SUPREME COURT OF THE STATE OF DELAWARE

AARON GARNETT, § 
§ No. 376, 2022
Defendant Below, §
Appellant, § Court Below: Superior Court
§ of the State of Delaware
v. §
§ Cr. ID No. 2003009148 (K)
STATE OF DELAWARE, §
§
Appellee. §


Submitted: July 26, 2023
Decided: October 24, 2023


Before **SEITZ**, Chief Justice; **VALIHURA, TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices constituting the Court *en banc*.


Upon appeal from the Superior Court. **AFFIRMED.**


ELLIOT M. MARGULES, Esquire, (*argued*) and NICOLE M. WALKER, Esquire, OFFICE OF DEFENSE SERVICES, Wilmington, Delaware, *for Appellant Aaron Garnett*.

ANDREW J. VELLA, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice, for the Majority:

After arresting Aaron Garnett in whose care were three young children, the police promptly sought to locate the children's parent or guardian. This search, initiated before sunrise on a cold and rainy day, led the police to a house where they were told the children's mother lived and was sleeping. Once there, the police knocked, then banged, on the front door and loudly announced their presence. When no one answered, one of the officers went to the rear of the house where, after another round of knocking and announcing, the officer noticed the back door was unlocked. He pushed open the unlocked door and, peering into the interior of the residence with the benefit of a flashlight, saw a motionless body under a blanket at the foot of a stairway. Joined now by his fellow officers, he entered the residence and found the lifeless body of Naquita Hill, the mother of one of the children whose welfare had motivated the police's efforts. Seven or so hours later, Garnett confessed that, during a heated argument, he had choked Hill until she slumped to the floor and beat her with his fist after that. After a jury trial, Garnett was convicted of Naquita Hill's murder, and we now consider his appeal.

Although the officer was not looking for contraband or other evidence when he opened the unlocked back door, Garnett contended below—and the State tacitly conceded—that the opening of the door and all that followed it was a search

2

implicating the Fourth Amendment. Hence, he moved to suppress the evidence police seized following their warrantless entry of the residence. This, according to Garnett, included Hill's body and the resulting forensic testing of it. He also moved to suppress his confession, arguing that it was derivative of the illegal entry. In two separate opinions,[1] the Superior Court denied Garnett's motion. The court found that the body and physical evidence found in the residence would have been discovered through lawful means in the absence of the illegal entry and, therefore, under the inevitable-discovery exception to the exclusionary rule, should not be suppressed. Likewise, the court concluded that Garnett's incriminatory statements to the police were admissible under the same inevitable-discovery exception and that, even if they were not, they were sufficiently attenuated from the illegality and thus not subject to exclusion. Garnett appeals both rulings.

For the reasons that follow, we conclude that the evidence Garnett asked the Superior Court to exclude was properly admitted at Garnett's trial. Consequently, we affirm his convictions.

I

Because Garnett's appeal challenges the Superior Court's denial of his motion to suppress physical evidence and his confession and does not claim any error at

---

[1] *State v. Garnett*, 2021 WL 6109797 (Del. Super. Ct. Dec. 23, 2021) ("*Garnett I*"); *State v. Garnett*, 2022 WL 610200 (Del. Super. Ct. Mar. 1, 2022) ("*Garnett II*").

trial, our discussion of the factual background, unless otherwise noted, is drawn from the suppression-hearing record.[2]

A

Shortly after 5:30 in the morning on March 15, 2020, several officers of the Dover Police Department responded to the Wawa convenience store on Forest Avenue in Dover, having received a report of an apparent "domestic incident" in progress there. The report was described variously as "a physical altercation between a parent and a child"[3] and an "adult male . . . grabb[ing] a juvenile by the neck."[4]

Corporal Anthony Toto was the first officer to arrive on the scene. When Corporal Toto entered the store, a store employee pointed to Garnett, who had three children with him. The oldest child, M.S.,[5] was ten years old. The next oldest was F.L., who was five years old. And Garnett was holding his five-month-old son, A.G.

---

[2] The Superior Court held a hearing on Garnett's motion to suppress on December 3, 2021. At this hearing, the court heard from seven police witnesses. In *Garnett I*, issued on December 23, 2021, the court denied Garnett's motion as to "Ms. Hill's body and all forensic testing resulting therefrom, all physical evidence seized from the home located at 32 Willis Road and photographs taken therein, and all clothing seized from Mr. Garnett[.]" *Garnett I*, at *7. But the court was not satisfied with the development of the factual record as to Garnett's statement and deferred ruling on its admissibility pending "an evidentiary hearing . . . outside the presence of the jury, pursuant to Delaware Rule of Evidence 104(a) and 104(c)(1)." *Id*. That hearing, at which the court heard from one of the previously testifying police witnesses, took place in January 2022 and resulted in *Garnett II*, issued three weeks before Garnett's trial began. We consider the suppression-hearing record as consisting of the evidence taken at both hearings.

[3] App. to Opening Br. at A58.

[4] *Id.* at A81.

[5] The Superior Court and the parties have referred to the children by their initials; we do the same here.

4

Corporal Toto described Garnett's demeanor at the time of their encounter as "very strange."[6] Among other things, he was holding his infant son not as "a normal parent would hold a baby"[7] or "cradling the baby like a normal parent";[8] instead, with his arms "extended out,"[9] he was holding the baby away from his body. Although it was a cold and rainy morning, none of the children was "dressed for the weather."[10]

Corporal Toto asked Garnett to step outside the store, leaving the children with other officers. Once outside, Garnett identified himself as Aaron Edwards and stated that his date of birth was July 18, 1995. He said that he came from Maryland to take custody of the children because their mother was in prison, but he was either unable or unwilling to provide the mother's name. Oddly enough, Garnett had no diaper bag, stroller, or other gear one would expect to see upon confronting an adult preparing to travel with three small children.

When Corporal Toto was unable to locate any records of an individual named Aaron Edwards born on July 18, 1995, he confronted Garnett with that fact. Garnett promptly admitted that he had provided "a fake name."[11] Around this time, Sergeant Jennifer Lynch joined the conversation. Garnett told Corporal Toto and Sergeant Lynch that the infant was his son and the other two boys were his nephews. He said

---

[6] App. to Opening Br. at A60.
[7] *Id.* at A61.
[8] *Id.*
[9] *Id.*
[10] *Id.* at A81.
[11] *Id.* at A65.

5

that he and the children had walked from an area Sergeant Lynch recognized as "the Towne Point neighborhood"[12] to the Wawa store on Forest Avenue. As the children soon disclosed, Garnett and the children had walked from 32 Willis Road, which is adjacent to Towne Point and over three miles from the Wawa store. Because Garnett had misidentified himself, Corporal Toto arrested him for criminal impersonation, placed him in handcuffs, and asked Patrol Officer Brandyn Clancy to transport Garnett to the Dover Police Department for processing.

Meanwhile, Patrol Officer Alicia Corrado took control of the children. When Officer Corrado first approached the children, M.S., who appeared nervous, was holding the baby. She noticed that none of the children was adequately dressed, given the weather. M.S. and F.L. related to Officer Corrado that Garnett had woke them up that morning "to take a walk."[13] The two young boys together were able to provide their address—32 Willis Road—with M.S. providing the street name and F.L. recalling the house number. They also told Officer Corrado that their mother— Naquita Hill—was at home sleeping. (It was later learned that Hill was A.G.'s mother and that, although the two older boys referred to Hill as their mother, she was actually their aunt). Officer Corrado noticed a scratch on M.S.'s neck and asked where it came from. M.S. said that Garnett had caused the mark.

---

[12] *Id.* at A83.
[13] *Id.* at A120.

After Officer Corrado and Corporal Toto brought the children back to the police station, she noticed two large items in M.S.'s pockets. M.S. shared that Garnett had given him the items and "told him to hide them in his pockets."[14] In short order, M.S. took the items out of his pocket and handed them over to Officer Corrado; they consisted of Garnett's cell phone and credit card and Naquita Hill's Social Security Card and driver's license. M.S. did not know why Garnett gave him these items to hide.

Meanwhile, three officers—Sergeant Lynch, PFC Joshua Krumm, and Patrol Officer Dale Starke—having learned where M.S. and F.L. resided, went to 32 Willis Road in the hope of locating the children's parent or custodian. The residence at that address is an end-unit row home. As Sergeant Lynch "stood off in the grass in the front yard,"[15] PFC Krumm and Officer Starke went to the front door and knocked on it, according to Sergeant Lynch, for "[o]ff and on . . . probably about two or three minutes."[16] These knocks, Officer Starke testified, were not "gentle knocks,"[17] and as he and PFC Krumm knocked they announced their presence as members of the Dover Police Department. They also shined their flashlights in the windows but to no avail.

---

[14] *Id.* at A124–25.
[15] *Id.* at A90.
[16] *Id.* at A91.
[17] *Id.* at A146.

Frustrated by his inability to elicit a response, Officer Starke made his way to the back door, while PFC Krumm and Sergeant Lynch stayed out front. Officer Starke knocked on the back door several times while announcing his presence but, as in the front, so in the back: no one responded. This caused Officer Starke, who understood that he was performing a "welfare check," to be concerned, so he checked the back-door handle; it was unlocked. Officer Starke radioed to Sergeant Lynch and PFC Krumm to let them know of the unlocked door. As PFC Krumm came around to the back door, Officer Starke pushed it open. Remaining outside, he peered inside with the aid of his flashlight and saw "a limb that was partially covered with a blanket."[18] Officer Starke and PFC Krumm again announced their presence, "calling from the door, trying to make announcements[.]"[19]

By this time, Sergeant Lynch had come to the back door. She described how the officers then discovered Naquita Hill's brutally battered body:

> I peek in. And pretty much from the back door, you can look straight through to the front residence. It's a row home. It's not very big. As soon you open the door, you are in the kitchen and in the living room and then the front door. And there are steps that go upstairs right at the front door. So as soon as you open the back door, you have a clear view of the victim that was laying on the ground. . . .

> So . . . I saw someone covered in a blanket. I saw fans of feet. I saw a right arm of someone. And I saw a reddish stain on the front of the blanket where, if it was a person, it would be where their face and head would be.

---

[18] *Id.* at A149.
[19] *Id.* at A92.

Immediately I thought we needed to check on this person. So we made entry into the house. I pulled the blanket back. And I saw the victim with bad trauma, severe trauma all over her face, swollen, bloody, a laceration on her forehead, a large pool of blood underneath her head from where she was laying. And I felt for a pulse.[20]

Feeling none, Sergeant Lynch, along with Officer Starke and PFC Krumm, made sure that the house was clear of assailants or other victims, attempted to administer first aid, and called for an ambulance. The officers did not search for evidence at that time. Naquita Hill, was "pronounced deceased"[21] at the scene. It was 6:50 a.m., about an hour and a half after the police encountered Garnett and the three children at Wawa convenience store.

The discovery of Naquita Hill's body was roughly contemporaneous with Officer Corrado's discovery that M.S. was, at Garnett's direction, hiding Hill's Social Security card and driver's license. And it was around that same time that Officer Clancy, while processing Garnett back at the station, noticed what appeared to be a blood stain of a "decent size" on one of Garnett's socks. Officer Clancy, upon seeing the stain, asked Garnett if he was injured; Garnett did not reply.

Eventually, the police secured a search warrant for 32 Willis Road. The application described, among other things, the officers' warrantless entry into the residence and their discovery of Naquita Hill's body. Unfortunately, the record is

---

[20] *Id.* at A92–93.
[21] *Id.* at A179.

unclear as to when the police applied for the warrant or when it was issued, and what, if any physical evidence was seized under the warrant. There is some evidence suggesting that the warrant was "executed" at 10:40 a.m.[22] We do know, however, that before the search warrant was issued, Detective Nolan Matthews, a Dover P.D. crime-scene investigator, entered 32 Willis Road. Detective Matthews described what he did upon his arrival.

> [W]e conducted an initial walk-through just to understand what consisted inside that scene. And when we realized that the victim on the floor had substantial injury and there was certain blood and other evidence inside the residence, that we didn't know how long it would take for the search warrant to be obtained at that point. So we wanted to make sure to preserve it as it sat before anyone had touched any piece of evidence, had collected anything. We wanted to try and preserve it through photography just so in the event that it takes several hours to take get a search warrant or, in this case, it did take several hours for the medical examiner's office to arrive, they would be able to even rely on our photos to better understand the injuries to the victim.[23]

Other than the photographs, no evidence was collected and "[n]othing was touched"[24] during this process.

At approximately 2:00 p.m., Detective Timothy Mullaney, Jr. and Detective Chris Bumgarner questioned Garnett. At the outset of the interrogation, Detective Mullaney tried to focus Garnett on what happened before Garnett and the children walked crosstown to the Wawa:

---

[22] *Id.* at A239.
[23] *Id.* at A161.
[24] *Id.* at A162.

10

DET. MULLANEY: So obviously, you know, we contacted you at the Wawa.

GARNETT: Mh hm.

DET. MULLANEY: Officers came there and talked to you there. We're more interested in what led up to obviously coming to the Wawa. You know, obviously went out to the house.

GARNETT: Mh hm.

DET. MULLANEY: I just want you to tell me what happened, okay?

GARNETT: I want to tell you a story.[25]

At first, in a confusing ramble that seems to have conflated his walk with the children to the Wawa that morning with a walk to the Wawa by himself either the night before or earlier that morning, Garnett claimed that he had discovered Hill's body on the floor upon returning to 32 Willis Road after walking to and from the Wawa. This, he claimed, prompted him, for reasons he could not explain, to flee the residence with the children. He insisted that he had nothing to do with Hill's death and was shocked by it. But the detectives confronted Garnett with Hill's journal, which they had lawfully obtained from Garnett's backpack following his arrest and which suggested that Garnett and Hill had a troubled relationship, and the tide began to turn. And approximately one hour into the interview, Garnett confessed that he

---

[25] The statements quoted herein are from a video recording admitted as State's Exhibit 6 at trial and attached in DVD format to the App. to Opening Br. at A307.

"did do that shit . . ."[26] and that he lost his temper during an argument with Hill, "got mad . . . and choked her."[27]  When Hill fell to the floor, Garnett continued to choke her and hit her with his fist.  When asked if Hill stopped breathing, Garnett replied: "I don't know.  I just know she was just laying there . . . And I didn't know what else to do . . . So I grabbed everybody . . . I grabbed my son.  I grabbed the boys, and I'm like, 'Let's just go.'"[28]  The crosstown trek on foot from Willis Road to the Wawa store followed.

B

Based on the factual background outlined above, Detective Mullaney applied for and was granted a warrant for Garnett's arrest for first-degree murder and three counts of endangering the welfare of a child.  Less than three months later, a Kent County grand jury returned an indictment, charging Garnett with murder in the first degree, two counts of endangering the welfare of a child, and offensive touching.  The endangering counts charged that Garnett had murdered Hill knowing that the crime was witnessed, by sight or sound, by two of the children, M.S. and F.L.  The offensive touching count related to Garnett's physically abusive grabbing of M.S. as reported to the police shortly after their encounter with Garnett earlier that morning.

---

[26] App. to Opening Br. at A307.
[27] *Id.*
[28] *Id.*

12

The Superior Court entered a scheduling order that included a pretrial motion deadline in August 2021 in anticipation of a trial in the fall of that year. Garnett filed a motion to suppress evidence—specifically, "[t]he body and all forensic testing resulting therefrom; . . . [a]ll physical evidence seized from the residence located at 32 Willis Road and photographs taken therein; . . . [a]ll clothing seized from Mr. Garnett; [and] . . . Mr. Garnett's taped statement."[29]

In his motion, Garnett alleged that he was a resident of 32 Willis Road and thus had standing to object to the search of the residence. He depicted the police officers' entry into the residence as "an unlawful warrantless search in violation of [his] Federal and State Constitutional rights . . . ,"[30] citing the Fourth Amendment to the United States Constitution and Article I, § 6 of the Delaware Constitution. Anticipating the State's response, Garnett argued that neither the emergency doctrine nor the inevitable-discovery exception was applicable to the warrantless entry into the residence. Hence, according to Garnett, all the evidence seized from the residence and his subsequent statement to the detectives was "fruit of the poisonous tree" subject to suppression.

The State responded by challenging Garnett's standing on two grounds—that Garnett was not a resident of Willis Road and, even if he were, he had abandoned

---

[29] *Id.* at A27.
[30] *Id.* at A23.

the residence. And as Garnett expected, the State invoked the emergency doctrine and the inevitable-discovery exception. For the State, the police had reasonable grounds to believe that there was an emergency at hand and "to respond to [the] residence for the dual purpose of checking on the safety of the [infant's] mother and finding the [other] children's guardian."[31] Entering the residence, according to the State, was reasonable under these circumstances. The evidence, moreover, that Garnett claimed to have been illegally obtained would inevitably have been discovered through legitimate means and therefore was not subject to suppression under the exclusionary rule. On the morning when the hearing on Garnett's motion was scheduled to begin, the State withdrew its challenge to Garnett's standing.

C

After hearing from seven police witnesses, on whose testimony our earlier factual discussion is based, the Superior Court, in two separate opinions,[32] denied Garnett's motion to suppress. Although it did not explicitly say so, in *Garnett I*, the Superior Court presupposed that the discovery of Naquita Hill's body was the product of an "illegal entry" into 32 Willis Road—"an invasion of the sanctity of the home."[33] Even so, its factual findings rejected Garnett's description of the "entry" in his motion to suppress. In his motion, Garnett alleged that:

---

[31] *Id*. at A41.
[32] See *supra* note 2.
[33] *Garnett I*, at *4.

14

MCPL Lynch, PFC Krum and PTLM Starke responded to 32 Willis Road to attempt to make contact with the mother or guardian of the children. Upon arrival, they knocked on the front door with no response. Ptlm. Starke went to the rear door of the residence and found it unlocked. Ptlm. Starke and Pfc. Krum, with guns drawn, opened the rear door and entered residence. *Upon entry, they noticed a person on the floor covered with a blanket.* They called EMS and attempted to give first aid[]. Ultimately, EMS arrived and pronounced Naquita Hill deceased.[34]

The Superior Court's factual findings differ from this account in one essential respect: in the court's findings, the police entered the residence only after they "saw what appeared to be a body covered by a blanket, with blood nearby."[35]

Upon arrival at the home, the officers knocked for two to three minutes at the front door, giving loud announcements, identifying themselves, and receiving no response. Patrolman Starke then headed to the rear of the home and knocked on the back door. After knocking very briefly– a minute–Patrolman Starke checked the doorknob and noticed that it was unsecured.

Immediately thereafter, Patrolman Starke radioed to the other officers that there was an unsecured door, and, without asking for permission from his supervisor, Sergeant Lynch (who was still at the front of the home), Patrolman Starke turned the knob and pushed the door inward. *With or without stepping into the home, Patrolman Starke and PFC Krumm shined flashlights into the home and saw what appeared to be a body covered by a blanket, with blood nearby. As soon as Sergeant Lynch made her way to the rear of the home and confirmed what Patrolman Starke and PFC Krumm had identified, the three officers entered the home and found the dead body of Naquita Hill.*[36]

---

[34] App. to Opening Br. at A22 (emphasis added).

[35] *Garnett I*, at *2.

[36] *Id.* In a footnote, the court expressed its view that "[b]ased on the testimony, whether or not the officers stepped into the home is unclear." *Id.* at *2 n.5. This observation is difficult to square with the testimony of Patrolman Starke, who said that "[a]s soon as the door opened, I could see a limb that was partially covered with a blanket." App. to Opening Br. at A149. This is consistent

Because the entry *after* the officers noticed the body would have been, in the absence of some other illegality, lawful,[37] we must assume that for the court, unlike for Garnett, the opening of the door was the intrusion that triggered the Fourth Amendment's warrant requirement, absent the applicability of its exceptions. As neither party has found this distinction relevant, we need not address it further.

D

The Superior Court's opinion in *Garnett I* is devoted to a review of the State's arguments that: (1) the officer's warrantless search was justified under the emergency doctrine, and (2) the inevitable-discovery exception to the exclusionary rule rendered suppression of the evidence obtained after the initial illegality inappropriate.

Under the emergency doctrine that this Court recognized in *Guererri v. State*,[38] the State was required to prove that:

> (1) [t]he police [had] reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property[;] (2) [t]he search [was] not . . . primarily motivated by intent to arrest and seize evidence[; and] (3) [t]here [was]

---

with the previously quoted testimony of Sergeant Lynch. See *supra* pp. 8–9. ("[A]s soon as you open the back door, you have a clear view of the victim that [*sic*] was laying [*sic*] on the ground. . . . I saw someone covered in a blanket[]. . . [a]nd I saw a reddish stain on the front of the blanket where, if it was a person, it would be where their face and head would be. . . . So we made entry into the house.").

[37] *See State v. Henderson*, 892 A.2d 1061, 1066 (Del. 2006) ("The plain view doctrine is an exception to the Fourth Amendment's warrant requirement for searches and seizures. Under that doctrine, 'the mere observation of an item in plain view does not constitute a Fourth Amendment search.'").

[38] 922 A.2d 403, 406 (Del. 2007).

some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.[39]

The Superior Court determined that the emergency doctrine was inapplicable, not because the facts could not support an inference that the children's guardian was in danger, but because the testimony of the officers themselves undermined that inference. Sergeant Lynch, for instance, testified that, had Patrol Officer Starke not opened the back door, the officers would have left the residence and returned later. And as the court put it, "the testimony of the officers who conducted the warrantless search was devoid of any indication that the Wawa incident . . . created a sense that the guardian of the children was in danger."[40] Thus, the court concluded that "at the time Patrolman Starke breached the 'sanctity' of the home, it was not a welfare check, as the State contended. It was an action by Dover PD to locate the guardian of the three children, not for the guardian's welfare but for the children's welfare."[41] And because the children were safely in the custody of the police, there was no justification for entering the home at that time.

The Superior Court was receptive, however, to the State's invocation of the inevitable-discovery exception to the exclusionary rule. Under that exception, if evidence found because of a Fourth Amendment violation would inevitably have

---

[39] *Id.* (*quoting People v. Bondi*, 474 N.E.2d 733, 736 (Ill. App. Ct. 1984)).
[40] *Garnett I*, at *4.
[41] *Id.* at *5.

17

been discovered through lawful means in the absence of the illegality, it would not be excluded.[42]

The Superior Court found as a factual matter that "at some point in the near future from when the officers warrantlessly entered the home, the officers would have re-attempted contact with the guardian and discovered the body pursuant to routine police procedures."[43]  In the court's view, the lawful means untethered to the earlier illegality through which the police would have gained access to the residence were two-fold.

First, the court was satisfied that, though there was no emergency at hand when the police entered the residence at 6:42 a.m., additional facts had come to light around the time of or not long after the first entry sufficient to justify a warrantless entry under the emergency doctrine.  The court pointed specifically to the discovery of the blood stain on one of Garnett's socks and the decedent's Social Security card and driver's license in M.S.'s pocket, which Garnett had instructed M.S. to hide. When these facts were considered together with the facts known at the time of the initial entry—Garnett's bizarre crosstown walk in the rain with the inadequately

---

[42] *See Cook v. State*, 374 A.2d 264, 267–68 (Del. 1977) ("This exception, which has found increasing judicial favor, provides that evidence, obtained in the course of illegal police conduct, will not be suppressed if the prosecution can prove that the incriminating evidence 'would have been discovered through legitimate means in the absence of official misconduct.'") (quoting Harold S. Novikoff, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules*, 74 Col. L. Rev. 88, 90 (1974)).

[43] *Garnett I*, at *5.

clothed children; surveillance footage from the Wawa store; the scratch on M.S.'s neck indicative of Garnett's violent interaction with M.S., and Garnett's inability to provide a coherent account of his reasons for being at the Wawa store—the police's concern for the welfare and safety of the children's guardian inside the residence on Willis Road would have been sufficiently elevated, in the court's opinion, to justify an emergency entry of the residence.

Alternatively, the Superior Court posited a second scenario that would have led the police to lawfully discover Naquita Hill's body and any related evidence in the residence: a search warrant "sought and obtained"[44] independently from information learned during the earlier misbegotten entry. This hypothetical search warrant would have been based on the same facts as would have justified the emergency entry, all of which were unknown to the officers who entered the Willis Road residence, but gathered by other officers around the time of or shortly after the entry. And importantly, none of those facts would have drawn upon the knowledge gained by the police when they entered the residence earlier that morning.

Based on these findings, the Superior Court concluded that "the inevitable discovery exception applie[d] to the physical evidence obtained from the home[]"[45]

---

[44] *Garnett I*, at *6.

[45] *Garnett I*, at *7. In its conclusion in *Garnett I*, the court wrote that the State had "justified the warrantless search [of the residence] pursuant to the inevitable discovery exception." To the extent that this statement suggests that the exception renders the initial illegality blameless, it is, in our view, misleading. The exception, properly understood, is to the exclusionary rule and not to the Fourth Amendment's prohibition of unreasonable searches and seizures.

and denied Garnett's motion to suppress as to that evidence and the clothing seized from Garnett. But the court was not satisfied that the record had been adequately developed as to the statements Garnett made during the interrogation several hours after the discovery of Ms. Hill's body. The court noted, more specifically, that:

> [t]here was little focus upon that statement at the hearing. Specifically, it is unclear whether law enforcement confronted Mr. Garnett during his statement with physical evidence obtained from the home and whether, and to what extent, that may have led to his ultimate confession. The timing of the statement itself is also unclear. In short, it is conceivable that had the physical evidence been discovered legally, and at a later time, Mr. Garnett's statement to police might have differed, and he might not have confessed to the crime.[46]

Consequently, the court deferred its ruling on the admissibility of the statement and scheduled "a Rule 104(a) hearing outside the presence of the jury regarding Mr. Garnett's statement to determine whether that evidence will be suppressed."[47]

E

Detective Mullaney, the State's sole witness at the supplemental hearing, established a timeline of the relevant events, starting with the Dover Police Department's receipt of the complaint from the Wawa store employee through Garnett's admission that he had choked and battered Naquita Hill. The timeline can be summarized as follows:

---

[46] *Id.*

[47] *Id.*; D.R.E. 104(a) ("The court must decide any preliminary questions about whether . . . evidence is admissible. In so deciding, the court is not bound by the evidence rules, except those on privilege.").

| | |
|---|---|
| 5:35 a.m. | Dover P.D. receives complaint. |
| 5:37 a.m. | First officer arrives at Wawa. |
| 6:18 a.m. | Police transport Garnett to Dover P.D. |
| 6:25 a.m. | M.S. and F.L. provide 32 Willis Road address. |
| 6:26 a.m. | Corporal Toto and Patrol Officer Corrado transport children to Dover P.D. |
| App. 6:26 a.m. | Officers dispatched to 32 Willis Road. |
| 6:42 a.m. | Officers discover Naquita Hill's body; simultaneously (or nearly so), back at Dover P.D., police discover Garnett's bloody sock and Naquita Hill's social security card and driver's license in M.S. pocket. |
| 6:50 a.m. | Emergency medical technicians arrive at 32 Willis and, shortly thereafter, pronounce Naquita Hill dead. |
| 8:13 a.m. | Dover P.D. detectives "clear" the scene. |
| 10:40 a.m. | Search warrant executed. |
| 10:46 a.m. | Child Advocacy Center ("CAC") interviews of M.S. and F.L. |
| 2:00 p.m. | Police begin interview of Garnett. |

Although Detective Mullaney did not provide the precise times of other investigative steps, he described other police activity preceding Garnett's interview. This activity included contacting Naquita Hill's sister, Rasheeda Hill, and Garnett's family, and arranging CAC interviews of M.S. and F.L. The record reflects that the CAC

21

interviews occurred before Garnett was interviewed, but the substance of the children's statements does not appear in the record.

Detective Mullaney then outlined the steps the investigating officers would have taken following Garnett's arrest had the officers not entered the residence at 32 Willis Road and discovered Naquita Hill's body that morning. The police would have first contacted a school resource officer and secured the school-age children's emergency contact information. That would have disclosed that Naquita Hill was the children's "mother" and that the children resided at 32 Willis Road. They also would have learned Rasheeda Hill's address through Criminal Justice Information Services. Following routine investigatory procedures, the police would have then contacted Rasheeda Hill in the hope that she would facilitate access to the home at 32 Willis Road.

Detective Mullaney then explained that, had the effort to gain access to the 32 Willis Road property with Rasheeda Hill's aid failed, the police would have promptly applied for a search warrant. The warrant application would have highlighted the unusual encounter with Garnett in the pre-dawn hours, Garnett's demeanor throughout, the children's statements regarding their "mother's" whereabouts, the unexplained bloody sock, and Garnett's instructions to M.S. to hide Naquita Hill's identification cards in his pocket.

Detective Mullaney also testified about the circumstances surrounding his 2:00 p.m. interview of Garnett. He acknowledged that he told Garnett early in the interview that the police "obviously went out to the house,"[48] but, from the detective's perspective, neither he nor Detective Bumgarner confronted Garnett with any evidence from the warrantless entry during the interview. The court also viewed and listened to the video recording of Garnett's interview while Detective Mullaney was on the stand.

F

With the suppression-hearing record thus fortified, the Superior Court turned in *Garnett II* to the admissibility of Garnett's statement. The court harkened back to its finding in *Garnett I* "that Ms. Hill's body and the other physical evidence found in the home would inevitably have been discovered through lawful police investigative procedures shortly after their actual discovery."[49] And based on the testimony offered at the supplemental hearing, the court found that the State had proved by a preponderance of the evidence that Garnett would not have been released before the inevitable, though necessarily hypothetical, discovery of the body. The court ticked off the reasons why it believed that Garnett would have

---

[48]App. to Opening Br. at A307.
[49] *Garnett II*, at *6.

23

remained in custody at least as long as it would have taken for the police to discover

Naquita Hill's body through lawful means. Those reasons included:

> 1) the bloody sock and the information regarding Garnett's instructing
> M.S. to "hide" Ms. Hill's identification cards . . . discovered almost
> simultaneously with the illegal entry; 2) [that] Garnett was being
> investigated, but not yet charged, for a domestic incident involving
> M.S. that had been substantiated on multiple levels; and 3) [that] there
> was a high likelihood that CAC interviews of the children would have
> been undertaken given the totality of the circumstances.[50]

This led the court to conclude that the timing of Garnett's interview would not

have been materially different had the police not entered the residence unlawfully

earlier that day. Put differently, had the police not entered the residence unlawfully

that morning but the body had been—as was found to be likely in *Garnett I*—

inevitably discovered later that morning, Garnett's statement would have been taken

under "the exact same circumstances as actually occurred. . . ."[51] Under this

scenario, however, the initial illegality would be irrelevant because the police would

have come into possession of the incriminating evidence lawfully. Put differently,

the fruit the police possessed under the inevitable-discovery scenario came not from

a poisonous tree but from a tree not tainted by the illegality. Thus, through this

extrapolation of the inevitable-discovery exception, the court ruled that Garnett's

statement should not be suppressed.

---

[50] *Id.*
[51] *Id.*

The Superior Court also found that "[e]ven if Garnett's statement is not admissible under the inevitable discovery doctrine, the attenuation doctrine renders his statement admissible."[52] In so finding, the court took heed of this Court's articulation of the doctrine in *Lopez-Vasquez v. State*:[53]

> The attenuation doctrine exception permits courts to find that the poisonous taint of an unlawful search and seizure has dissipated when the causal connection between the unlawful police conduct and the acquisition of the challenged evidence becomes sufficiently attenuated. Thus, even if there is an illegal search or seizure, direct or derivative evidence . . . may still be admissible if the taint is sufficiently purged.[54]

When the derivative evidence is the defendant's custodial statement, *Miranda* warnings, by themselves, are insufficient to break the causal connection. In addition to *Miranda* warnings, whether the taint of a prior illegality has been purged, the court noted, should be determined with reference to three factors: "(1) the temporal proximity of the illegality and the acquisition of the evidence to which the instant objection is made; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official conduct."[55]

The court found that the "temporal proximity" factor was "neutral"[56] and that the third factor—the purpose and flagrancy of the official misconduct—weighed

---

[52] *Id.*

[53] 956 A.2d 1280 (Del. 2008).

[54] *Id*. at 1293 (footnotes and quotation marks omitted).

[55] *Garnett II*, at *7 (quoting *Lopez-Vasquez*, 956 A.2d at 1293); *see also Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

[56] *Garnett II*, at *7.

heavily against excluding Garnett's statement.[57]  But at the heart of the court's

attenuation analysis was its identification of a critical intervening circumstance—

"Garnett's own voluntary, unelicited admission . . . near the beginning of the taped

statement, that he was aware of the presence of Ms. Hill's dead body at 32 Willis

Road."[58]  Of equal importance was the court's conclusion that "[n]o evidence from

the illegal search was used by the officers to confront Garnett."[59]  In the court's eyes,

Hill's journal was the only evidence with which the police confronted Garnett, and

the journal had been lawfully seized, itself another intervening circumstance.  For

the Superior Court

> it was not the questioning officers who disclosed to Garnett the
> discovery of the body and other evidence obtained at the home, thereby
> exploiting that evidence to obtain a confession, but it was Garnett who
> first disclosed that he was aware of the evidence.  That circumstance
> cured the illegally obtained evidence of any taint that could have
> resulted had the officers initially disclosed the illegally obtained
> evidence to Garnett.  Put another way, Garnett's confession is "remote"
> from the illegal police conduct due to Garnett's own disclosure that he
> was aware of the presence of the body.[60]

Accordingly, the Superior Court denied Garnett's motion to suppress the

recorded statement.

---

[57] *Id.* at *9.
[58] *Id.* at *8.
[59] *Id.*
[60] *Id.*

G

Garnett's jury trial in Superior Court took place over the course of four days in March 2022. For the most part, the testimony at trial tracked the suppression-hearing testimony. But the jury also heard from four witnesses who did not testify during the suppression hearing.

In very brief testimony, a Wawa store employee confirmed that there were surveillance cameras in the store; the court then admitted the video without objection. And the forensic pathologist from the Delaware Division of Forensic Science who performed Naquita Hill's autopsy offered her opinion that the cause of Naquita Hill's death was "compression of [the] neck and chest and multiple blunt force injuries."[61] But the two witnesses who tied Garnett to those injuries were M.S. and F.L., twelve and seven years old, respectively, at the time of trial.

M.S. described how Garnett had woke him up around 5:00 a.m. on the day he, Garnett, and his two brothers walked from Willis Road to the Wawa store in west Dover. According to M.S., Garnett "told us to put our stuff on and then just walked us out the house."[62] But before they left the house, he saw "Naquita laying on the floor . . . [c]lose to the steps,"[63] with a blanket covering her face. As they left, M.S.

---

[61] App. to Answering Br. at B190.
[62] Id. at B127.
[63] Id. at B128.

27

watched as Garnett "stomped on her face."[64]  M.S. also explained that on their walk to the Wawa store, they stopped at a Royal Farms store, where Garnett gave M.S. his aunt's phone and wallet.  Garnett told M.S. to throw away the phone and wallet, but he put them in his pocket.  Once at the Wawa store, Garnett admonished M.S.: "say something again and I'll kill you."[65]  And then, in M.S.'s words, "he choked me out."[66]

F.L.'s testimony was briefer than, but consistent with, M.S.'s testimony.  He described how Garnett, who he identified as his cousin, "woke us up with his foot . . . and . . . brung us to Wawa."[67]  Before leaving the house, he saw Naquita Hill "covered up"[68]—next to the stairs.  As F.L. put his shoes on, he saw Garnett "stepping on Naquita."[69]

After the prosecution rested its case, Garnett's counsel advised the court that the defense would not call any witnesses.  The following day, after hearing counsel's closing arguments and the court's instructions, the jury returned its verdict, finding Garnett guilty as charged on all counts.  The court revoked bond and ordered a presentence investigation.  The Superior Court later sentenced Garnett to incarceration for the balance of his natural life plus one year and 30 days.

---

[64] *Id.* at B131.
[65] *Id.* at B129.
[66] *Id.*
[67] *Id.* at B134–35.
[68] *Id.* at B135–36.
[69] *Id.* at B136.

## H

Garnett raises three arguments on appeal. First, he challenges the Superior Court's finding that, had the police not entered the home at 32 Willis Road without a warrant, they would have, in relatively short order, entered it lawfully and discovered Naquita Hill's body. This, according to Garnett, was an abuse of the court's discretion. Next, Garnett argues that the Court erred in finding that Garnett's confession was not the unattenuated fruit of the unlawful entry into the home. According to Garnett, this, too, was an abuse of the court's discretion. And finally, Garnett contends that the Superior Court erroneously rejected his contention that there should be no inevitable-discovery exception under Article I, § 6 of the Delaware Constitution.

## II

We review the trial court's order denying a motion to suppress under a mixed standard of review.[70] We review findings of fact for clear error, but we exercise *de novo* review over legal determinations.[71] "[A] [t]rial [c]ourt's determination that . . . evidence would have been inevitably discovered constitutes a finding of fact. . . .

---

[70] *See Lopez-Vazquez*, 956 A.2d at 1285 & nn.1, 2; *Banther v. State*, 823 A.2d 467, 486 (Del. 2003).
[71] *Id.*

29

Such a finding, unless clearly erroneous and not supported by the record, may not be overturned[.]"[72]

III

A

In *Jones v. State*, this Court observed that "[a]n individual's right to be free of unlawful searches and seizures in Delaware is secured by two independent, though correlative sources."[73] The Fourth Amendment to the United States Constitution provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[74]

Article I, § 6 of the Delaware Constitution contains similar, though not identical language:

> The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.

---

[72] *DeShields v. State*, 534 A.2d 630, 638 (Del. 1987) (citing *Nix v. Williams*, 476 U.S. 431, 448–50 (1984)).
[73] 745 A.2d 856, 860 (Del. 1999).
[74] U.S. CONST. amend. IV.

The United States Supreme Court has interpreted the Fourth Amendment as "safeguard[ing] the privacy and security of individuals against arbitrary invasions by governmental officials."[75] This interpretation follows from the historical context in which the amendment was drafted; it was intended as a response to "the reviled 'general warrants' and 'writs of assistance' of the colonial era [that] allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity."[76]

The amendment limits intrusion into citizens' private lives by permitting the government to make only "reasonable" searches and seizures, which generally requires that law enforcement procure a warrant before conducting a search of something over which a citizen holds a reasonable expectation of privacy: "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant."[77] "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."[78]

---

[75] *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Mun. Ct. of City and Cnty. of San Francisco,* 387 U.S. 523, 528 (1967)).
[76] *Riley v. California*, 573 U.S. 373, 403 (2014).
[77] *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 653 (1995).
[78] *Riley*, 573 U.S. at 382.

The warrant requirement would be toothless, however, without an enforcement mechanism to provide a remedy for and deter violations of it.[79] Enter the exclusionary rule, which precludes the introduction of evidence at trial obtained in violation of a defendant's Fourth Amendment right to be free from illegal searches and seizures, including evidence derivatively acquired as a result of the unconstitutional search or seizure (referred to as "fruit of the poisonous tree").[80] The rule achieves its deterrence function "by removing the incentive to disregard it[,]"[81] because there is no reason for law enforcement to seek out evidence of a crime in an unlawful manner when doing so disqualifies its use at trial. In so ensuring that investigations are conducted in accordance with constitutional prescripts, the exclusionary rule prevents courts from becoming "accomplices in the willful disobedience of a Constitution [that] they are sworn to uphold."[82]

---

[79] *See Weeks v. United States*, 232 U.S. 383, 393 (1914) ("If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring his right to be secure against such searches and seizures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.").

[80] *Elkins v. United States*, 364 U.S. 206, 209 (1960). *See Jones v. State*, 745 A.2d at 872 ("The exclusionary rule acts as a remedy for a violation of a defendant's right to be free of illegal searches and seizures. It provides for the exclusion from trial of any evidence recovered or derived from an illegal search and seizure."). *See also United States v. Williams*, 615 F.3d 657, 668 (6th Cir. 2010) ("[the] exclusionary rule is supplemented by the 'fruit of the poisonous tree' doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure.").

[81] *Elkins*, 364 U.S. at 217.

[82] *Id.* at 223.

Even so, all evidence that comes to light but for an unlawful action by law enforcement is not necessarily "fruit of the poisonous tree."[83]  As Justice Powell noted in his concurring opinion in *Brown v. Illinois*, "in some circumstances strict adherence to the Fourth Amendment exclusionary rule imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent purposes."[84]  Accordingly, the United States Supreme Court long ago chose not to extend the exclusionary rule where the police learn of the challenged evidence from an independent source[85] or where "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.'"[86]  Undergirding these exceptions is the principle that, "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied."[87]

Similar considerations form the foundation of yet another exception—the inevitable-discovery exception—which is at center stage in this appeal.  First clearly applied in the World War II-era case of *Somer v. United States*,[88] and later recognized by this Court in 1977 in *Cook v. State*,[89] "[t]his exception . . . provides

---

[83] *Williams*, 615 F.3d at 668.
[84] 422 U.S. at 608–09 (Powell, J. concurring).
[85] *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).
[86] *Wong Sun v. United States*, 371 U.S. 471, 487 (1963) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).
[87] *Murray v. United States*, 487 U.S. 533, 542 (1988).
[88] 138 F.2d 790 (2d Cir. 1943).
[89] 374 A.2d 264.

that evidence, obtained in the course of illegal police conduct, will not be suppressed if the prosecution can prove that the incriminating evidence would have been discovered through legitimate means in the absence of official misconduct."[90]

In *Cook*, three men suspected of armed robbery were detained and subjected to a weapons-frisk, which uncovered a shotgun shell and cash. The men were then transported to a police station where a routine inventory of their personal property led to the discovery of more cash. The men were convicted of the robbery and appealed, arguing that the money discovered during the weapons-frisk was the product of an unlawful search and thus should have been excluded during their trial.

In analyzing the defendants' claim, this Court assumed, without deciding, that the "seizure of the currency exceeded the scope of a reasonable search for weapons," but concluded "that the evidence [wa]s admissible under the inevitable-discovery exception to the exclusionary rule[]."[91] The Court noted that, in light of the routine inventory search conducted at the police station, the defendants' case was "clear[ly] [] the type of situation intended to fall within the purview of the exception" as

> [t]he majority of the cases employing the inevitable discovery exception involve instances in which the illegal police conduct occurred while an investigation was already in progress and resulted in the discovery of evidence that would have eventually been obtained through routine police investigatory procedure. The illegalities in such cases, therefore, had the effect of simply accelerating

---

[90] *Id.* at 267–68 (quotation marks omitted).
[91] *Id.* at 267.

the discovery. In general, where the prosecution can show that the standard prevailing investigatory procedure of the law enforcement agency involved would have led to the discovery of the questioned evidence, the exception will be applied to prevent its suppression.[92]

In short, because the defendants in *Cook* would have been arrested and subjected to the routine inventory search of their belongings regardless of the evidence uncovered during the weapons-frisk, the discovery of the cash on their person was, "inevitable" and that cash was thus admissible.

Despite the "increasing judicial favor" with which the exception was received in the 1960's and 70's, it was not recognized by the United States Supreme Court until 1984 in *Nix v. Williams*.[93] The facts of *Nix* are well-known. A man murdered a ten-year-old girl in Des Moines, Iowa and was asked by police, in violation of his right to counsel, where he had left the body. His decision to guide the officers to the spot where his victim lay allowed local police to call off an ongoing search of the area. The Iowa Supreme Court—ruling on the defendant's motion to suppress the evidence of the body, in addition to evidence derived from an autopsy of the body—held that the evidence was admissible under the inevitable-discovery exception because it would have been discovered by the search party if not for the defendant's assistance.

---

[92] *Id*. at 268 (quoting Harold S. Novikoff, *supra* note 42 at 91).
[93] 467 U.S. 431.

The Supreme Court, acknowledging that the "'vast majority' of all courts, both state and federal, recognize an inevitable-discovery exception to the exclusionary rule[,]"[94] upheld the Iowa court's finding, noting that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence should be received."[95] Importantly, the court explicitly rejected the notion advanced by the defendant that, for the inevitable-discovery doctrine to apply, "the prosecution must prove the absence of bad faith," holding that such a requirement "would place courts in the position of withholding from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity [and would also] put the police in a worse position than they would have been in if no unlawful conduct had transpired."[96]

*Nix* is most often cited for the twin guardrails that it built into the doctrine, requiring proponents of improperly obtained evidence to demonstrate, under a "preponderance evidentiary burden," that the discovery of the tainted evidence was inevitable.[97] Put differently, *Nix* demands that prosecutors invoking the exception

---

[94] *Id.* at 440.
[95] *Id.* at 444.
[96] *Id.* at 445.
[97] Tonja Jacobi & Elliot Louthen, *The Corrosive Effect of Inevitable Discovery on the Fourth Amendment*, 171 U. Pa. L. Rev. 1, 10–11 (2022).

prove: "first, that police legally *could* have uncovered the evidence; and second, that police *would* have done so."[98]

B

We first address Garnett's contention that the Superior Court erred "by holding [that] the Delaware Constitution incorporates the inevitable discovery doctrine as described in *Nix v. Williams*."[99] By this, we understand him to mean that, as a matter of state constitutional law, we should not recognize the inevitable-discovery exception to the exclusionary rule. Were we to agree, our consideration of Garnett's other arguments would be superfluous.

Garnett points out—and correctly so—that a provision of our state constitution can provide broader protection than is found in an analogous federal constitutional provision. Seizing upon this principle, Garnett asks us to establish a greater degree of protection under Article I, § 6 of the Delaware Constitution than is provided by the analogous Fourth Amendment to the United States Constitution. His plea is not altogether foolhardy as "it is well established that this Court will, where appropriate, extend our state constitutional prohibition against unreasonable searches and seizures beyond the protections recognized in the United States Supreme Court's Fourth Amendment jurisprudence."[100] But Garnett seems to argue

---

[98] *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019) (emphasis in original).
[99] Opening Br. at 27.
[100] *Juliano v. State*, 254 A.3d 369, 378 (Del. 2020).

37

that because we *can* provide—and have in the past provided—greater protection, we must do so here. We have never approached the interpretation of the protections afforded by Article I, § 6 in that manner. Instead, our state constitutional analysis in this context has two steps:

> First is the determination whether, as a general matter, the state constitutional provision under which a person seeks refuge provides different and broader protection than a similar federal constitutional provision. Second, and the step that is in play here, is whether that broader protection is properly applied to the police conduct . . . challenged in the case before us.[101]

Garnett clears the first hurdle; indeed, we removed it in *Jones v. State*,[102] this Court's decision a quarter century ago in which we recognized that Article I, § 6 "reflected *different* and *broader* protections than those guaranteed by the Fourth Amendment."[103] But Garnett fails to persuade us that the inevitable-discovery exception to the exclusionary rule is inconsistent with Article I, § 6's prohibition against unreasonable searches and seizures.

Garnett's principal argument in favor of rejecting the inevitable-discovery exception is that, while the primary purpose of the federal exclusionary rule is to deter future unlawful police conduct, the exclusionary rule under our state constitution operates as "a remedy for a violation of a defendant's right to be free of

---

[101] *Id*. at 379.
[102] 745 A.2d 856.
[103] *Id.* at 866 (emphasis in original).

illegal searches and seizures."[104]  But this argument conflates the remedy of suppression, which excludes evidence that the police would not have found but for unlawful conduct and the reward that would attend the suppression of evidence that the police would inevitably have found absent the illegality.

Put another way, the suppression of evidence that would inevitably have been discovered in the counterfactual world in which law enforcement has not misstepped in the first instance would confer a benefit on the accused that far outstrips the remedial aspect of the exclusionary rule.  The remedy of exclusion, properly administered, puts the accused where he would have been absent the illegality.  The prosecution is deprived of evidence that it would not have collected except by way of law enforcement's unlawful conduct.  By contrast, the remedy as Garnett envisions it, puts the accused in a far better place by excluding evidence that would have been lawfully collected absent the illegality.  We are not persuaded that Article I, § 6 of the Delaware Constitution contemplates such generous redress.

We are satisfied, moreover, that our conclusion that the inevitable-discovery exception is compatible with Article I, § 6 is consistent with this Court's jurisprudence under that section.  We note specifically that the case upon which Garnett relies most heavily for the proposition that Article I, § 6 provides broader protections than does the Fourth Amendment recognized the viability of exceptions,

---

[104] Opening Br. at 29 (quoting *Dorsey v. State*, 761 A.2d 807, 818 (Del. 2000)).

including the inevitable-discovery exception, to the exclusionary rule. In *Jones*, cited and quoted above, this Court, on state constitutional grounds, declined to follow the United States Supreme Court's definition of "seizure" under the Fourth Amendment. The Court also discussed the parameters of the exclusionary rule as it applied to the seizure of evidence during an unlawful arrest, which Jones had resisted. But the Court was careful to distinguish the facts before it from other cases in which the exclusionary rule is in play:

> The exclusionary rule acts as a remedy for a violation of a defendant's right to be free of illegal searches and seizures. It provides for the exclusion from trial of any evidence recovered or derived from an illegal search and seizure. But the United States Supreme Court has found exceptions to this rule in situations where . . . the police inevitably would have discovered the evidence. *We have held that official misconduct should not fatally taint evidence that would have been discovered absent that official misconduct. The case before us is different, however.*[105]

In short, Garnett has not convinced us that the inevitable-discovery exception to the exclusionary rule is inherently inconsistent with Article I, § 6 of the Delaware Constitution.[106] We do believe, however, that a court considering the exception's

---

[105] *Jones*, 745 A.2d at 872–73 (emphasis added) (quotations omitted).

[106] We are not surprised that a review of opinions from around the United States addressing the inevitable-discovery exception under state constitutional provisions has not uncovered a case presenting the unique facts that we encounter here. It bears noting, however, that the majority of the states that have considered the inevitable-discovery exception under their state constitutions have recognized its validity, though some, as we do here, have limited its application. *See Smith v. State*, 948 P.2d 473, 478–81 & n.6 (Alaska 1997) (recognizing under Alaska Constitution art. I, § 22 but limiting application "where the police have intentionally or knowingly violated a suspect's rights."); *State v. Ault*, 724 P.2d 545, 551–52, 556 (Ariz. 1986) (recognizing under art. 2, § 8 of

40

the Arizona Constitution but limiting application); *McDonald v. State*, 119 S.W.3d 41, 47, 44 & n.2 (Ark. 2003) (recognizing under art. 2, § 15 of the Arkansas Constitution); *People v. Diaz*, 53 P.3d 1171, 1175–76 (Colo. 2002) (recognizing the exception in reviewing the suppression of evidence under both the Fourth Amendment and art. II, § 7 of the Colorado Constitution); *State v. Correa*, 264 A.3d 894, 903, 936 (Conn. 2021) (recognizing under art. first, § 7 of the Connecticut Constitution); *Clayton v. State*, 252 So.3d 827, 829–30 (Fla. Dist. Ct. App. 2018) (recognizing but limiting application under art. I, § 12 of the Florida Constitution); *State v. Phillips*, 382 P.3d 133, 157 (Haw. 2016) (recognizing under art. I, § 7 of the Hawaii Constitution); *State v. Ubben*, 938 N.W.2d 722, 2019 WL 3317866, at *2 (Iowa Ct. App. July 24, 2019) (TABLE) (recognizing under art. I, § 8 of the Iowa Constitution); *State v. Thompson*, 155 P.3d 724, 731 (Kan. Ct. App. 2007) (finding that evidence seized in a search "in violation of the Fourth Amendment . . . and § 15 of the Kansas Constitution Bill of Rights" was admissible under the inevitable discovery doctrine); *State v. Rabon*, 930 A.2d 268, 276 (Me. 2007) (recognizing under art. I, § 5 of the Maine Constitution); *Com. v. O'Connor*, 546 N.E.2d 336, 339–41 (Mass. 1989) (recognizing but limiting application under pt. 1, art. 14 of the Massachusetts Constitution); *State v. Little*, 604 S.W.3d 708, 720 (Mo. Ct. App. 2020) (recognizing under art. I, § 15 of the Missouri Constitution); *State v. Ellis*, 210 P.3d 144, 148 (Mont. 2009) (discussing but limiting application of the inevitable discovery in resolving a claim under art. II, §§ 10, 11 of the Montana Constitution), *see also State v. Dickinson*, 184 P.3d 305, 310–11 (Mont. 2008) (reviewing denial of motion to suppress under the Fourth Amendment and Article II, § 11 of the Montana Constitution, noting that "most state and federal jurisdictions recognize the inevitable discovery doctrine . . . [m]oreover we have applied the inevitable discovery doctrine in numerous cases"); *State v. Robinson*, 164 A.3d 1002, 1007, 1010 (N.H. 2017) (recognizing under part 1, art. 19 of the New Hampshire Constitution); *State v. Cawley*, 2015 WL 1540683, at *5 (N.J. Super. Ct. App. Div. Apr. 7, 2015) (recognizing evidence as admissible "under our State Constitution" but limiting application through a three-part analysis), *see also Tartaglia v. Paine Webber, Inc.*, 794 A.2d 816, 820 (N.J. Super. Ct. App. Div. 2002) ("even when evidence illegally obtained by the police violates the Fourth Amendment or State Constitution, *see* N.J. Const. art. I, ¶ 7, it is nevertheless admissible if 'inevitably discoverable'") (citation omitted); *State v. Wagoner*, 24 P.3d 306, 311 (N.M. 2001) (recognizing the exception as "ha[ving] a place in New Mexico law under art. II, § 10 of the New Mexico Constitution but not reaching the question of what "safeguards" are required for application); *People v. Saldana*, 906 N.Y.S.2d 775 (N.Y. City Ct. 2009) (citing *People v. Stith*, 506 N.E.2d 911, 913 (N.Y. 1987) (recognizing the exception under art. I, § 12 of the New York Constitution); *State v. Garner*, 417 S.E.2d 502, 507, 510–11 (N.C. 1992) (recognizing under art. I, § 20 of the North Carolina Constitution)); *State v. Holly*, 833 N.W.2d 15, 31–32, 35 (N.D. 2013) (recognizing under art. I, § 8 of the North Dakota Constitution but requiring the state to prove the absence of bad faith); *State v. Barnes*, 96 N.E.3d 969, 974–75 (Ohio Ct. App. 2017) (recognizing the exception when analyzing a claim under both the Fourth Amendment and art. I, § 14 of the Ohio Constitution); *State v. Steele*, 414 P.3d 458, 462–63 (Or. Ct. App. 2018) (recognizing under art. I,

application must consider the character of the police misconduct leading to the unlawful discovery and seizure of the challenged evidence. We share the concern of the exception's critics, including that of our dissenting colleagues, that applying the exception incautiously could encourage law enforcement to intentionally bypass the warrant requirement.[107] Therefore, our holding that the inevitable-discovery

---

§ 9 of the Oregon Constitution); *Com. v. Berkheimer*, 57 A.3d 171, 182 (Pa. Super. Ct. 2012) (recognizing but limiting application under art. I, § 8 of the Pennsylvania Constitution); *State v. Sinapi*, 295 A.3d 787, 805–06, 809 n.14 (R.I. 2023) (recognizing the inevitable discovery doctrine as a grounds to affirm denial of motion to suppress in a claim under art. I, § 6 of the Rhode Island Constitution and noting that "we accord the federal interpretation [deference] when construing article 1, section 6"); *State v. Stewart*, 867 S.E.2d 33, 37–38 (S.C. Ct. App. 2021) (recognizing under art. I, § 10 of the South Carolina Constitution); *State v. Barefield*, 814 S.E.2d 250, 262 (W. Va. 2018) (recognizing under art. III, § 6 of the West Virginia Constitution); *State v. Jackson*, 882 N.W.2d 422, 439–41 (Wis. 2016) (recognizing under the Wisconsin Constitution). We have identified only three states that have flatly rejected the exception on state constitutional grounds. *See Ammons v. State*, 770 N.E.2d 927, 935 (Ind. Ct. App. 2002) ("the inevitable discovery exception has not been adopted as a matter of Indiana constitutional law."); *Hitchcock v. State*, 118 S.W.3d 844, 849 (Tex. App. 2003) ("the inevitable discovery doctrine violates Article 38.23 of the Texas Code of Criminal Procedure (also known as the Texas exclusionary rule)" which states, in part, that evidence obtained in violation of the Texas Constitution shall not be admitted into evidence); *State v. Winterstein*, 220 P.3d 1226, 1233 (Wash. 2009) ("there is no established inevitable discovery exception under article I, [§] 7 [of our state constitution]").

[107] In many of the cases cited by the dissent in which courts either rejected or refused to apply the inevitable-discovery exception on state constitutional grounds, law enforcement's conduct was strikingly dissimilar from the unlawful entry in this case, which was not a search to uncover evidence. For instance in both *Com. v. Mason*, 637 A.2d 251 (Pa. 1993) and *State v. Lashley*, 803 A.2d 139 (N.J. Super. Ct. 2002), the police used battering rams to illegally enter defendants' homes in search of evidence related to drug crimes. In *State v. Ault*, 724 P.2d 45 (Ariz. 1986) and *State v. Sugar*, 417 A.2d 474 (N.J. 1980), the police entered the homes of individuals suspected of crimes without warrants—in the first case to take the defendant to the station for questioning, and in the second, they entered the property with shovels and dug for a body. Similarly in *Com. v. Perel*, 107 A.3d 185 (Pa. Super. Ct. 2014) the police entered the defendant's girlfriend's home (with consent), but they were explicitly searching for evidence of a crime committed by the defendant and searched his personal items. By contrast, Garnett's case involves a benevolent entry into a residence to locate a parent or guardian, in the absence of whom three young children would remain in the care of strangers.

exception is compatible with Article I, § 6 assumes that it will be applied only when it is clear that "the police have not acted in bad faith to accelerate the discovery of the evidence in question."[108] Here, the officers did not act in bad faith. Rather, as found by the Superior Court, the officers were attempting to locate the mother of young children who were in police care because of Garnett's arrest.

Our colleagues in dissent disagree with our state constitutional analysis. They view our adoption of the requirement that a reviewing court must consider whether the officers' unlawful conduct was the product of bad faith as a disavowal of our holding in *Dorsey v. State*[109] and the adoption of a good-faith exception to the exclusionary rule. Not so. The good-faith exception recognized in *United States v. Leon*[110] allows the admission of unlawfully seized evidence based on the seizing officers' good faith reliance on a warrant. The inevitable-discovery exception, by contrast, allows the admission of the evidence not because of the officers' good faith but because the evidence would inevitably have been discovered.

---

[108] *State v. Phelps*, 297 N.W. 2d 769, 775 (N.D. 1990); *see also Com. v. O'Connor*, 546 N.E. 2d 336, 340 (Mass. 1989) ("Bad faith of the police, shown by such activities as conducting an unlawful search in order to accelerate discovery of the evidence, will be relevant in assessing the severity of any constitutional violation."). The Massachusetts court noted, however, that it had "declined to apply an inevitable discovery rule to justify admission of evidence seized in violation of the requirement that a search warrant be obtained, even if it was inevitable that, if sought, a search warrant would have been issued and the evidence would have been found." *Id*. The Supreme Court rejected this limitation, i.e., in the absence of bad faith, in *Nix*. 467 U.S. at 445. Thus, we are puzzled by the dissent's characterization that we are recognizing "a completely unlimited Inevitable Discovery Exception. . . ." Dissent at 60 n. 199.

[109] 761 A.2d at 818.

[110] 468 U.S. 897 (1984).

43

*Dorsey* itself serves to illustrate this distinction. In that case, the police searched Dorsey's motor vehicles under a search warrant that was unsupported by probable cause. More specifically, the search warrant application in *Dorsey* failed to establish a logical nexus between the items sought (bloody clothing and firearms) and the place to be searched (Dorsey's motor vehicles). There was no suggestion that, absent the vehicle searches conducted under the deficient warrant, the police would have discovered the seized evidence lawfully. This distinction, in our view, makes a difference. The evidence in *Dorsey* would never have been found. Here, as the trial court found, the lawful discovery of Naquita Hill's body was certain to occur. The fact that triggers the exception to the exclusionary rule under these circumstances is not the officers' good faith; rather, it is the inevitable lawful discovery of evidence. In short, that we condition its application on the absence of bad faith does not convert the inevitable-discovery exception into a good-faith exception *á la Leon*.[111]

---

[111] The dissent further criticizes the majority for "rest[ing] [our] decision solely on the federal rationale of deterrence and ignor[ing] our state's separate constitutional interests." Dissent at 2. Deterrence, of course, along with the "safeguar[ing] [of] constitutional rights" is the "primary purpose of the federal exclusionary rule. . . ." *Lopez-Vasquez*, 956 A.2d at 1291. True, that this court recognized that the exclusionary rule under our state constitution serves interests beyond deterrence—specifically, remedial interests. But that does not mean that deterrence is no longer a relevant consideration when we are defining the appropriate reach of the rule. And here, where we conclude that suppression of a readily discoverable dead body as evidence is a remedy that outruns the remedial interests to be served, we are not inclined to ignore the remaining deterrence interest. The dissent also chides us for ignoring that a crime scene investigator took photographs of the scene before the search warrant was issued and "dismissively refer[ring] to the [police] conduct as 'benevolent entry.' Dissent at 44 n. 150. As to the latter complaint, we stand by our

C

We turn next to Garnett's contention that the trial court abused its discretion by finding that, had the police not entered the residence at 32 Willis Road illegally, they would have done so legally and discovered Naquita Hill's body under a valid search warrant or while addressing an emergency.

1

The principal thrust of Garnett's argument is that "[i]nevitability is only a reasonable conclusion when (absent the illegality) the evidence would have been discovered by separate and pre-existing investigation [] or [] routine procedures would have guided the investigation to the evidence."[112]  For Garnett, the court's finding that "the officers would have re-attempted contact with the guardian and [legally] discovered the body pursuant to routine police procedures,"[113] is not supported by the record.  We disagree.

Garnett argues that, because the police entry into the residence occurred at a time when their investigative activity had not yet ripened into a formal investigation

_____

characterization of the officers' search for the children's custodian and their entry into the home after seeing an immobile human body covered in a blanket at the foot of a staircase.  The police did not enter the residence to search for evidence; instead, they were motivated by their concern, in the first instance, for the children, and then Ms. Hill.  In that sense, their entry was truly "benevolent."  And as to the former concern, no one has contended that the crime scene at the time the photographs were taken was materially different than what it was a few hours later when the police would inevitably have entered the residence lawfully.

[112] Opening Br. at 10.

[113] *Id.* at 10–11 (quoting *Garnett I*, at *5).

of a crime whose victim was Naquita Hill, the court must ignore the inevitable discovery of her dead body through lawful means. This position is, in a word, untenable. The fact that the inevitable-discovery exception is typically invoked in cases where a criminal investigation is in progress does not mean that it may only be invoked in that context. To be sure, the prosecution can more easily prove inevitable discovery when it can point to well-defined, step-by-step practices it routinely employs to investigate suspected crimes. But it is not the case—and Garnett has not cited any authority for the proposition—that the inevitable-discovery exception is strictly limited to that context.

2

Having rejected Garnett's bid to graft a pre-existing investigation/routine procedure restriction onto the inevitable-discovery exception, we look to the suppression-hearing record to determine whether the trial court's factual finding that the challenged evidence would inevitably have been discovered lawfully was clearly erroneous. As mentioned, whether evidence would have been inevitably discovered is a question of fact. "We must adopt [the trial court's] factual findings . . . as long as there is sufficient evidence in the record to support them and the finding are not clearly erroneous."[114]

---

[114] *State v. Abel*, 68 A.3d 1228, 1232 (Del. 2012).

As we review the record, we cannot ignore the bizarre circumstances surrounding the police officer's initial encounter with Garnett at 5:30 a.m. Garnett and three children—one an infant and all inadequately dressed—had just walked three miles on that cold and rainy morning. Garnett, who had reportedly manhandled one of the children, misidentified himself and gave a facially incredible explanation of what he and the children were up to. Soon after that, the police discovered that Garnett had given Naquita Hill's Social Security card and driver's license to the 10-year old M.S. and asked him to hide those items. And around the same time, the police found what appeared to be blood on one of Garnett's socks, for which he had no explanation. All these things the police knew within the first hour and a half of Garnett's detention. They fully support the trial judge's finding that "Dover PD was on a mission to find the children's guardian. . . ."[115]

The question remains, however, whether and how the police would discover Naquita Hill's body. Little imagination is required to envision whether and how that would happen. Better yet, though, was the testimony of Detective Mullaney, which outlined the course that would have been taken had Patrol Officer Starke not pushed open the unlocked door, exposing Naquita Hill's lifeless body. That the need to

---

[115] *Garnett I*, at *6.

identify the children's guardian was urgent is obvious, and the avenues for accomplishing that task were various.

According to Detective Mullaney, the first investigative step would have been to identify the children's emergency contact information through a school resource officer. Obtaining this information could be accomplished "within minutes" as it was merely "a matter of making a phone call."[116] Detective Mullaney would have hoped to identify a relative in a position to consent to police entry into 32 Willis Road. Failing that, the police, according to Detective Mullaney, would have promptly applied for a search warrant.

Under this hypothetical scenario, the search warrant application would have recited the facts discussed above: the unusual encounter at Wawa store; Garnett's demeanor (described by the officers as "very strange,"[117] "evasive,"[118] and "nervous."[119]); the children's confirmation that Naquita Hill was in the residence; Naquita Hill's failure to respond to the police banging on the house's doors; the unexplained blood on Garnett's sock; the apparently purloined and hidden identification cards; the injury on M.S.'s neck; and information provided by the children during their CAC interviews.

---

[116] App. to Opening Br. at A244.
[117] *Id*. at A75.
[118] *Id*. at A138.
[119] *Id*.

For the Superior Court, these facts provided alternative courses of action, both legal, that would have led to the discovery of Naquita Hill's body. First, armed with facts that were unknown when Patrol Officer Starke opened the unlocked door, the police, the trial court found "would have had reasonable grounds to believe that there was a life-threatening emergency at hand requiring their immediate assistance."[120] And because the motive for entering the residence would then be to assist Naquita Hill and there would have been a reasonable basis to associate the emergency with the residence, the police would have been justified in entering the residence without a warrant under the emergency doctrine. Alternatively, the police would have sought and obtained a search warrant as discussed above.

We note here that the Superior Court invoked the emergency doctrine as one potential source of the eventual inevitable discovery of Naquita Hill's body in *Garnett I*, before the "Rule 104 hearing" supplemented the suppression-hearing record. During that hearing, Detective Mullaney did not suggest that the police would have entered the house to address a perceived emergency. He was clear that, instead, the police would have applied for a search warrant. Therefore, we limit our analysis to the trial court's finding that the police would have in fact applied for, and the facts would have supported the issuance of, a search warrant for 32 Willis Road.

---

[120] *Garnett I*, at *6.

Garnett challenges this finding on three grounds. First, he argues that, "[a]pplying for a warrant is not inevitable unless the process is initiated before the illegal search."[121] Second, Garnett contends that Detective Mullaney's testimony about the steps the police would have taken absent the earlier unlawful entry were insufficiently certain. And third, he argues that, had the police applied for a warrant, one would not have been issued.[122]

In support of his argument that the police's hypothetical warrant application was not inevitable because it was initiated after the illegal search, Garnett cites three Delaware Superior Court decisions, none of which stands for that proposition. In *State v. Harris*,[123] the trial judge was not persuaded by the detective's "self-serving" testimony that, in the absence of the consent to search a locked toolbox, he would have applied for a warrant. And *State v. Lambert*[124] and *State v. Preston*,[125] though both involved unlawful searches while search warrant applications were pending, do

[121] Opening Br. at 15.
[122] Despite this limitation, our colleagues' dissent puts the "highly questionable 'inevitable emergency' rationale" front and center in its analysis. Dissent at 1. We assume that this is because, having decided that a lawfully obtained search warrant would not have been sufficient to disarm the exclusionary rule, the dissent was compelled to address the trial court's alternative finding. The majority holds firm to the view that we need not address the "inevitable emergency" rationale. In a similar vein, the dissent points out that "there is a distinction between the Independent Source Doctrine and the Inevitable Discovery Doctrine . . . [,] and [t]he Independent Source Doctrine also does not apply here." Dissent at 25. We note that neither the State nor the trial court sought to justify the admission of the challenged evidence under the independent-source doctrine and, for that reason, have not addressed it.
[123] 642 A.2d 1242, 1251 (Del. Super. Ct. 1993).
[124] 2015 WL 3897810 (Del. Super. Ct. June 22, 2015), *aff'd*, 149 A.3d 227 (Del. 2016).
[125] 2016 WL 5903002 (Del. Super. Ct. Sept. 27, 2016).

not recognize or establish a rule that a pending warrant application is a *sine qua non* of the inevitable-discovery exception. To be clear, we agree with the court's statement in *Preston* that "[i]nvocation of the exception is *particularly appropriate* when routine police investigatory procedures are in progress and the challenged behavior merely accelerates discovery of the evidence."[126] But we find no support for the notion that invocation of the exception is *only appropriate* under those circumstances.

Turning to Garnett's concern about the certainty of Detective Mullaney's testimony that, if the police were unable to locate a relative who could consent to the entry into the residence, they would have applied for a warrant, we see this as a quibble with the trial court's fact-finding and, in particular, its determination that Detective Mullaney was a credible witness. As we recently observed,

> [w]hen a trial court acts as fact-finder, its findings will not be disturbed on appeal if they are supported by the record and are the product of an orderly and logical deductive process. When the determination of facts turns on the credibility of the witnesses who testified under oath before the trial judge, this Court will not substitute its opinion for that of the trial judge.[127]

Adhering to these principles, we reject Garnett's challenge to this factual finding.

And finally, we also disagree with Garnett's assertion—largely conclusory— that "regardless of what was in the [search warrant] application, it simply would not

---

[126] *Id.* at *4 (emphasis added.)
[127] *Wheeler v. State*, 296 A.3d 363, 373 (Del. 2023) (quotation marks and footnotes omitted).

satisfy the probable cause and nexus requirements to search a home."[128]  On this point, the Superior Court's finding that the State had proved by a preponderance of the evidence that the police would have applied for *and obtained* a warrant to enter 32 Willis Road was amply supported by Detective Mullaney's recitation of the myriad troubling facts we have previously discussed.

D

Garnett mounts a two-pronged attack on the Superior Court's ruling in *Garnett II* that his statements to the police during the afternoon following his arrest were admissible under the inevitable-discovery doctrine or, alternatively, under the attenuation doctrine.  First, he contends that the court-engaged in "pure speculation" when it concluded that "Garnett would inevitably have confessed in an interview under a different set of circumstances."[129]  Relatedly, he claims that "[b]ut for the illegal entry, Garnett would not have, inevitably, still been at the station . . . when [the] police decided to interrogate him."[130]  Second, Garnett argues that, without the illegal entry, the interview questions would have been different.  For these reasons, Garnett contends that the statements are the unattenuated fruit of the poisonous tree subject to suppression.

1

---

[128] Opening Br. at 17.
[129] *Id.* at 22.
[130] *Id.* at 23.

Both arguments crumble under the weight of the Superior Court's factual findings, as set forth in the following passage from *Garnett II*:

> In *Garnett I*, this Court found that Ms. Hill's body and the other physical evidence found in the home would inevitably have been discovered through lawful police investigative procedures shortly after their actual discovery. In addition, the State has proven by a preponderance of the evidence that Garnett would not have been released from custody prior to the discovery of the body because 1) the bloody sock and the information regarding Garnett's instructing M.S. to "hide" Ms. Hill's identification cards was discovered almost simultaneously with the illegal entry; 2) Garnett was being investigated, but not yet charged, for a domestic incident involving M.S. that had been substantiated on multiple levels; and 3) there was a high likelihood that CAC interviews of the children would have been undertaken given the totality of the circumstances.
>
> Finally, the timing of Garnett's statement would have changed at most minimally, if at all, and not in a way that would have affected the circumstances surrounding the questioning or Garnett's state of mind. . . . Here, Garnett would have been questioned in nearly the exact same circumstances as actually occurred and would have made materially the same statements to the officers.[131]

These factual findings—all supported by the suppression-hearing record—fatally undermine Garnett's contention that, but for the illegal entry, his interview by the police would have occurred under a different set of circumstances. The court found *as a factual matter* that it would not have been so.

Garnett also contests the court's finding that there was a "'high likelihood' he would still be in custody"[132] in the afternoon hours when he made the incriminatory

---

[131] *Garnett II*, at *6.
[132] Opening Br. at 23.

53

statements, had the unlawful search not occurred.  But this argument misstates the court's findings—the reference to a "high likelihood" in *Garnett II* related only to the timing of the children's CAC interviews.  In any event, the State was not required to prove the elements of the inevitable-discovery exception to an absolute certainty. Rather, the State was required to prove the elements of the exception by a preponderance of the evidence.[133]  The suppression-hearing record supports the Superior Court's determination that the State carried its burden.

The Superior Court's factual findings also undercut the principal authority Garnett cited in support of his argument that the inevitable-discovery exception should not be applied to confessions, as opposed to physical evidence obtained in the wake of an unlawful search or seizure.  Garnett points out that in *United States v. Vasquez De Reyes*,[134] the United States Circuit Court of Appeals for the Third Circuit upheld the suppression of the incriminating statement De Reyes made while detained following an unlawful stop.  The Third Circuit recognized that unlike physical evidence, which "absent its removal will remain where left until discovered . . . a statement not yet made is, by its very nature, evanescent and ephemeral.  Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same."[135]  But this observation, with which we

---

[133] *DeShields*, 534 A.2d at 638.
[134] 149 F.3d 192 (3d Cir. 1998).
[135] *Id*. at 196.

have no quarrel, is of marginal utility here given the trial court's factual findings that (i) Naquita Hill's body would inevitably been discovered well before Garnett would have been released even had the police not opened the unlocked door earlier that morning, and (ii) in the wake of that inevitable discovery, Garnett would have been questioned at the same time and under the same circumstances as he was in the actual event. These findings stand in contrast to the facts in *Vasquez De Reyes*, which, according to the Third Circuit, "just as plausibly" pointed to a conclusion that the challenged evidence would not have been discovered.[136] Here, Garnett has not posited a plausible scenario under which Naquita Hill's body would not have been discovered while Garnett was still in custody and subject to interrogation.[137]

For these reasons, we conclude that the Superior Court did not err when it denied Garnett's motion to suppress his incriminating statements.

2

Because we have concluded that Garnett's statements were admissible under the Superior Court's formulation and application of the inevitable-discovery

---

[136] *Id.*

[137] This is not to say that Garnett bore the burden of proof on the issue of inevitable discovery; the trial court correctly allocated that burden to the State in this case. But the majority cannot ignore the obvious question for which neither Garnett nor our dissenting colleagues have *any* answer: under what scenario would the police not have lawfully discovered Hill's body?

exception, we need not address the court's alternative finding that the statements were admissible under the attenuation doctrine.

IV

In upholding the Superior Court's application of the inevitable-discovery exception in this case, we are mindful of the risk that an unduly expansive application of the exception could encourage law enforcement to bypass important constitutional constraints. As a leading Fourth Amendment scholar has observed, "[i]f the doctrine were applied when such a shortcut was intentionally taken, the effect would be to read out of the Fourth Amendment the requirement that other, more elaborate and protective procedures be followed."[138] But this is not such a case. The police here were not engaged in an aggressive or reckless search for evidence when the patrol officer pushed open the unlocked door; to the contrary, they were engaged in a well-intended search in the interest of three small and undoubtedly frightened children. The Superior Court recognized the relevance of this context, engaged in careful fact-finding, and applied the relevant legal principles in a thoughtful manner; we therefore affirm its judgment.

---

[138] Wayne R. LaFave et al., *Search & Seizure: A Treatise on the Fourth Amendment* § 11.4 at 343 (5th ed. 2012).

**VALIHURA, J. dissenting, joined by GRIFFITHS, J.:**

*I.    Summary of Conclusions*

The application of the Inevitable Discovery Exception to the warrantless entry of the home in this case is questionable as a matter of Fourth Amendment law because it hinges on either a highly questionable "inevitable emergency" rationale, or on the "hypothetical warrant" theory.  Even if the Majority's result passes muster under the Fourth Amendment, Delaware law is decidedly different when it comes to our core constitutional protections relating to the Exclusionary Rule and the purposes it serves.  Delaware's Constitution is more protective, especially in the core area of searches of our citizens' homes.

Garnett's argument under Article I, § 6 is as follows:  Historically, Delaware constitutional law has developed differently and in a more protective fashion than the United States constitutional law in several areas.  Search and seizure law is one of them.[1] Delaware, for example, declined to follow the federal path by holding that there is no Good Faith Exception to the Exclusionary Rule.  The Exclusionary Rule provides for the exclusion at trial of any evidence recovered or derived from an illegal search or seizure. The reason for that departure is that Delaware law recognizes certain state constitutional dimensions beyond the federal purpose of deterring police misconduct.  A citizen's right to privacy in her own home is one such paramount state constitutional dimension.  Further, our Delaware Constitution provides that there is no constitutional wrong without a remedy.

---

[1] Our analogue to the Second Amendment, (Article I, § 20 of the Delaware Constitution) is another.

In this case, no one disagrees that the police violated both the U.S. and Delaware Constitutions when they entered the house without a warrant. No one disputes that the police had plenty of time to obtain a warrant, assuming that they could have established probable cause (which is not clear as of the time of entry). Not only did they enter the house without a warrant, their evidence detection team walked around and took dozens of photographs in the house even before beginning a warrant application. The police then relied on that illegally obtained evidence when they eventually applied for a warrant. Then, the State used that illegally obtained evidence at trial.

The Majority rests its decision solely on the federal rationale of deterrence and ignores our state's separate constitutional interests. The Majority's holding also runs afoul of our Delaware Constitution's requirement that there must be a remedy for a violation of this conceded constitutional violation. I part company with the Majority, because the Inevitable Discovery Exception cannot be applied consistently with Article I, § 6 in the circumstances here which involve a warrantless entry by police into one's home. Such warrantless entries into a home are presumptively unreasonable. The Majority's decision now declares that as long as the police can establish that they eventually would have found the disputed evidence, even via a non-routine unspecified route, they need not apply for a warrant before a neutral magistrate, and can instead, enter the home, and while they are there, can gather evidence to eventually use against the citizen at trial.

I explain that under Article I, § 6, the evidence of Ms. Hill's body should have been suppressed, as well as the photographic evidence that was taken in the house at a time when there was no warrant. And because the warrant ultimately obtained for the search of the

2

home made extensive use of the illegally obtained evidence, that search cannot be considered an "independent source" of that evidence.

Finally, I explain that the detailed confession by Garnett and other evidence obtained beyond the search of the home was properly admitted. I believe that Garnett could be retried on the basis of his confession and the other evidence that is untainted by the illegal conduct.

## II.  Key Facts Regarding Entry Into the Home

### A.  Entry Without a Warrant

Officers Starke, Krumm, and Lynch arrived at 32 Willis Road at 6:26 a.m. searching for the guardian of the children.[2]  Officers Starke and Krumm initially attempted to make contact by loudly announcing themselves and knocking on the front door, which they did with no answer for two to three minutes.[3]  Officer Lynch waited in the front yard while Officers Starke and Krumm used their flashlights to peer in through the windows.  Officer Starke then went to the back of the residence and initiated the same procedure, except this time he checked to see if the rear door was open.  Before opening the door, Officer Starke radioed the other officers and announced that there was an unsecured door at the back of the house.

---

[2] App. to Opening Br. at A237 (Detective Timothy Mullaney Testimony on Jan. 14, 2022 at 12:11–13) [hereinafter "Mullaney Test. II at [_]"].  Citations in the form of "[Last Name] Test. at [_]" refer to witness testimony from the evidentiary hearing transcripts.

[3] *Id*. at A146–47 (Officer Dale Starke Testimony on Dec. 3, 2021 at 97:1–98:3) [hereinafter "Starke Test. at [_]"]; *Id.* at A90–91 (Officer Jennifer Lynch Testimony on Dec. 3, 2021 at 42:13–42:14) [hereinafter "Lynch Test. at [_]"].

3

Officer Krumm joined Officer Starke at the back of the residence at which point the officers opened the door, bringing into view a body covered by a blanket. After calling Officer Lynch, they announced their identities and presence, entering the residence after receiving no response.[4] Officer Lynch attempted to render medical services to the victim but this effort failed, and at this point, the officers could tell that the victim, later identified to be Ms. Hill, was deceased. At no point did Officer Starke hear or see any disturbances from outside of the residence. He never asked for permission to enter the residence or open the door. Officer Starke testified that if it had been locked he would have asked for permission from Officer Lynch. Officer Starke stated that his impression of the situation, an unsecured door, and lack of response to announcements led to heightened concern.

Detective Timothy Mullaney Jr. was the on-call detective on March 15, 2020.[5] Detective Mullaney testified in the evidentiary hearing that if the officers had left the residence after knocking on the front door to no avail, he would have eventually obtained

---

[4] *Id.* at A150–51 (Starke Test. at 101:10–102:3). The officers entered the home with their service weapons drawn. A149 (Starke Test. at 100:16–23). The Trial Court found that "[w]ith or without stepping into the home, Patrolman Starke and PFC Krumm shined flashlights into the home and saw what appeared to be a body covered by a blanket, with blood nearby." *Garnett I*, 2021 WL 6109797, at *2 (Del. Super. Dec. 23, 2021) [hereinafter "*Garnett I*"]. The trial court acknowledged that the testimony regarding whether the officers stepped into the home *before* seeing Ms. Hill's body was unclear. *Id.* at *2 n.5. The finding that the evidence is unclear is entitled to deference as it was based upon live testimony and credibility assessments. Nonetheless, opening the door to 32 Willis Road and entering the home, unlocked or locked, constituted an unlawful warrantless entry. Obtaining evidence and taking photos was an unlawful search. The State has never asserted that Ms. Hill's body was in plain view nor did the State cross-appeal the holding that the Emergency Exception did not apply. Indeed, the Majority acknowledges that neither party found the distinction regarding the extent of the physical intrusion before seeing the body as relevant.

[5] *Id.* at A172 (Detective Timothy Mullaney Testimony on Dec. 3, 2021 at 123:14–19) [hereinafter "Mullaney Test. I at [_]"].

4

a search warrant for the residence through his personal routine process of contacting the school resource officers. This, Detective Mullaney testified, could have been accomplished in a matter of minutes and could have led to a relative opening the home for police as an alternative to the police obtaining a search warrant. Officer Lynch testified that if the rear door to the residence had been locked, she would have tried knocking again later.

### B. Collection of Evidence Without a Warrant

Thereafter, Detective Nolan Matthews, a certified crime scene investigator, went to the residence to take pictures of the body and document the crime scene.[6] He agreed that he walked "all through the house" and took around 40 to 50 photographs.[7] Detective Matthews was aware that a warrant had not been issued as of that time. He stated that given the changes a recently deceased body undergoes, it was necessary to preserve the evidence.[8] He testified that a search warrant could take hours before being granted. The record before us is silent as to when the application for the warrant was made,[9] but we

---

[6] *Id.* at A160–61 (Detective Nolan Matthews Testimony on Dec. 3, 2021 at 111:23–112:22) [hereinafter "Matthews Test. at [_]"]. He testified that he "was there to document, collect, preserve evidence as the crime scene investigation." *Id*. at A160:20–22.

[7] *Id*. at A165 (Matthews Test. at 116:5–6, 14–16).

[8] *Id.* at A162 (Matthews Test. at 113:11–23) ("So blood settles in a body. It can cause — just the coloration of someone's skin tone will change just because blood begins to settle more and more towards the lowest setting portion of the body, which could cause changes in the, you know, how an injury is visualized, how you see it. So, obviously things change.").

[9] Delaware Supreme Court, *Oral Argument Video*, Vimeo, at 3:35–4:01 (July 26, 2023) https://livestream.com/delawaresupremecourt/events/10877231/videos/237022476.

> The Court: At what time was the warrant actually applied for? We know it was obtained sometime around 10:40 in the morning.

know that a search warrant for the premises was obtained at 10:40 a.m. At that point, the officers reentered the residence to confirm the evidence obtained by Detective Matthews, and gather more physical evidence, including swabs of blood, a broken stool and lamp, and certain blood-stained items.

### III. *The Trial Court's Ruling on the Motion to Suppress Evidence Found in the Home*

The suppression hearing was held on December 3, 2021.[10] The Superior Court denied the motion as to the evidence collected from the property on December 23, 2021, but ordered an additional hearing on the statement, which was held on January 14, 2022.[11] The motion to suppress was denied as to the oral evidence on March 1, 2022.[12] The trial court considered both the Emergency Exception and the Inevitable Discovery Exception as possible exceptions to the exclusion of the physical evidence obtained from 32 Willis Road. It found the Emergency Exception to be inapplicable but that the Inevitable Discovery Exception did apply.

In determining whether the Emergency Exception applied, the Superior Court applied this Court's three-pronged test in *Guererri v. State*.[13] The trial court determined that the first prong, which requires an immediate need to protect life or property, was not

---

Garnett's Counsel: Right. The record, I don't believe, is explicit on that. There's record evidence about when the warrant return happened, but there was questioning during the second hearing, and I believe the officer did not have the necessary documentation, as best as I recall.

[10] *Id.* at A52–218 (Suppression Hearing Transcript on Dec. 3, 2021).

[11] *State v. Garnett*, 2021 WL 6109797, at *7. *See* A226–306 (Transcript of 104(a) Evidentiary Hearing on Jan. 14, 2022).

[12] *State v. Garnett*, 2022 WL 610200, at *9 (Del. Super. Mar. 1, 2022) [hereinafter "*Garnett II*"].

[13] *Id.* at 4 (citing *Guererri v. State*, 922 A.2d 403, 406 (Del. 2007)).

6

satisfied because the reason the officers went to the residence was to look for the guardian of the children. There was no emergent situation or concern that anyone was in danger. Accordingly, the trial court did not consider the remaining prongs of the test.

The trial court then turned to the Inevitable Discovery Exception. Applying the U.S. Supreme Court's decision in *Nix v. Williams*,[14] and this Court's decision in *Cook v. State*,[15] the trial court posited two ways the Dover police would have discovered the evidence absent the entrance of the residence on their first visit, under the Inevitable Discovery Exception:[16]  (1) The children would have increasingly required their mother, and the search for her inevitably would have led them to 32 Willis Road, or there would have been increasing evidence that something had happened to Ms. Hill to require an entry into the home; and (2) there was enough evidence at the time given the stained sock, the incident at the Wawa, and the fact that M.S. was keeping Ms. Hill's identification hidden on request of Garnett, that a magistrate would have granted a search warrant of the home that was indicated to be the residence of the children through school records.

IV. *The Law Construing Delaware's Constitution Follows the Federal Constitution's Fourth Amendment in a Few Respects But Differs in Key Respects Relevant to this Appeal*

A. *General Overview of the Separate Constitutional Provisions*

There are relevant, key differences between our Delaware Constitution and the U.S.

---

[14] 467 U.S. 431 (1984).

[15] 374 A.2d 264 (Del. 1977).

[16] *Garnett I*, 2021 WL 6109797, at *5 (citing *Nix,* 467 U.S. at 449–50; *Cook*, 374 A.2d at 267–68 (Del. 1977)).

Constitution. When we take the oath of office as judicial officers, we swear to always uphold and defend the Constitution of both "my Country and my State."[17] Our Delaware Supreme Court has observed that "Delaware judges cannot faithfully discharge the responsibilities of their office by simply holding that the Declaration of Rights in Article I of the Delaware Constitution is necessarily in 'lock step' with the United States Supreme Court's construction of the federal Bill of Rights."[18]

As one federal appellate judge has observed, "virtually all of the foundational liberties that protect Americans originated in the state constitutions and to this day remain independently protected by them."[19] Our federal system gives state courts the final say over the meaning of our own state constitutions. So as long as a state court's interpretation of its own constitution does not violate a federal requirement, it will stand.[20]

Delaware's original Constitution and Declaration of Rights "were adopted in September 1776 — approximately two months after the Declaration of Independence and fifteen years *before* the federal Bill of Rights."[21] Our constitutions of 1792, 1831, and 1897 followed the 1776 Delaware Constitution. Delaware's Declaration of Rights, enacted in 1776, preserved all of the freedoms that had been guaranteed by English common law. The

---

[17] *Dorsey v. State*, 761 A.2d 807, 814 (Del. 2000).

[18] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 662 (Del. 2014).

[19] Jeffery Sutton, *51 Imperfect Solutions, States and the Making of American Constitutional Law* 1 (2018).

[20] *Id*. at 16.

[21] *Dorsey*, 761 A.2d at 815 (emphasis in original). *See Commonwealth v. Edmunds*, 586 A.2d 887, 896 (Pa. 1991) ("Thus, contrary to the popular misconception that state constitutions are somehow patterned after the United States Constitution, the reverse is true.").

8

first nineteen sections of Delaware's Bill of Rights have remained almost unchanged since 1792.[22] The drafters who wrote it were many of the same people who wrote the U.S. Constitution and Bill of Rights. As a result, it is no surprise that the documents have many overlapping provisions with similar or identical wording.[23]

However, regarding our rights and liberties as citizens, there are several areas of law where Delaware has granted more expansive rights than the U.S. Constitution. For

---

[22] Article I, § 20, the Delaware right to bear arms, and Article I, § 21, the Delaware Equal Rights Amendment, are the later additions. Del. Const., art. 1, § 20; Del. Const., art. 1, § 21.

[23] Of the original Thirteen Colonies, Delaware, Pennsylvania, and Connecticut share nearly identical language, albeit differences in punctuation and adverbs. Del. Const. art. I, § 6; Conn. Const. art. I, § 7 (uses "nearly" instead of "particularly," and "nor without" instead of "nor then, unless"); Pa. Const. art. I, § 8 (same). In *Jones*, we observed that "these [search and seizure] provisions in the Constitutions of Delaware and Connecticut, as well as Pennsylvania, New Jersey and other states tracing their roots to the thirteen original colonies, share venerable origins that precede the adoption of the Fourth Amendment to the United States Constitution." *Jones v. State*, 745 A.2d 856, 867 (Del. 1999). New Jersey, New York, Rhode Island, and Georgia mirror the federal language, with minor differences. N.J. Const. art. I, ¶ 7; N.Y. Const. art. I, § 12; R.I. Const. art. I, § 6; Ga. Const. art. I, § 1, ¶ XIII. After the Civil War, South Carolina adopted the federal language but added an additional protection from unreasonable invasions of privacy. S.C. Const. art. I, § 10. The New Hampshire and Massachusetts language is unique but still largely similar to Delaware and the federal Constitution. Mass. Const. Pt. 1, art. XIV; N.H. Const. Pt. 1, art. 19. Differing the most from Delaware's is the language of Maryland, North Carolina, and Virginia, which centers around a prohibition of general warrants. Va. Const. art. I, § 10. The language of this group mirrors Delaware's provision pre-1792, under the original Delaware Declaration of Rights and Fundamental Rules of the Delaware State. Declaration of Rights and Fundamental Rules of the Delaware State § 17 (1776); *Dorsey*, 761 A.2d at 816.

Additionally, Garnett cites to the constitutions of Arizona, Indiana, Washington, and West Virginia, asserting that the state courts of those states rejected or limited the Inevitable Discovery Exception. Although the historical development of their provisions may be different, they are, nonetheless, persuasive in that they emphasize privacy of the home for the purposes of search and seizure requirements. Of those states, West Virginia and Indiana mirror the federal language in their state constitutions. W. Va. Const. art. III, § 6; Ind. Const. art. I, § 11. Arizona and Washington have identical language to each other and uniquely protect "private affairs" and the home from invasion "without authority of law." Ariz. Const. art. II, § 8 ("No person shall be disturbed in his private affairs, or his home invaded, without authority of law."); Wash. Const. art. I, § 7 (same).

example, as we recognized in *Jones v. State*, "we have held that the Delaware Constitution provides greater rights than the United States Constitution in the preservation of evidence used against a defendant, the right of confrontation, the right to counsel, and the right to trial by jury."[24] More recently, we have expressly held that our right to bear arms under Article I, § 20 of the Delaware Constitution is more expansive than the Second Amendment.[25] Here, I focus on search and seizure law, the Exclusionary Rule, and its exceptions — a key area where Delaware's Constitution is unquestionably more protective of citizens' rights than the Fourth Amendment.[26]

### B.    *Garnett's Separate Claim Under the Delaware Constitution*

The federal Fourth Amendment, sent to the states in 1789 and ratified by Delaware in January 1790 and adopted by the U.S. as a whole in 1792, specifies that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[27]

---

[24] 745 A.2d at 863 (citing *Hammond v. State*, 569 A.2d 81, 87 (Del. 1989), *Van Arsdall v. State*, 524 A.2d 3, 6–7 (Del. 1987), *Bryan v. State*, 571 A.2d 170, 176 (Del. 1990), *Claudio v. State*, 585 A.2d 1278, 1298 (Del. 1991)).

[25] *See Bridgeville Rifle & Pistol Club, Ltd. V. Small*, 176 A.3d 632, 642 (Del. 2017) (observing that on its face, Article I § 20 is "intentionally broader than the Second Amendment," and that "our Delaware Constitution may provide 'broader or additional rights' than the federal constitution, which provides a 'floor' or baseline rights.").

[26] *See, e.g., Juliano v. State*, 254 A.3d 369, 377 (Del. 2020) ("Nowhere has this stance, which rejects a 'lock step' interpretation of our state constitutional protections in conformity with the United State Supreme Court's interpretation of the federal Bill of Rights, been more evident than in the area of search-and-seizure law.").

[27] U.S. Const. Amend. IV.

10

Article I, § 6 of the Delaware Constitution ("Article I, § 6"), written and ratified in 1792 states:

> The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.[28]

Despite the similarity in language, our Court has held that Article I, § 6 grants broader protection than the Fourth Amendment in several areas.[29] Garnett bases his arguments on both constitutions.

Garnett argues that the record does not support that either emergency or warrant-based entry were inevitable. He argues that the trial court erred in failing to recognize that the Delaware Constitution "applies more protection in this scenario than does the Federal Constitution."[30] He reasons that as applied in the federal system, the Inevitable Discovery Exception is based upon the U.S. Supreme Court's determination that the purpose of the Exclusionary Rule is deterrence, and that deterrence is outweighed by the societal benefits of admitting the tainted evidence. But he argues that Delaware's Exclusionary Rule is based upon an entirely different purpose, thereby rendering the federally-based cases

---

[28] Del. Const. art. I, § 6.

[29] *See Juliano*, 254 A.2d at 378 ("[I]t is well established that this Court will, where appropriate, extend our state constitutional prohibition against unreasonable searches and seizures beyond the protections recognized in the United States Supreme Court's Fourth Amendment jurisprudence."); *Jones*, 745 A.2d at 863–64; *Edmunds*, 586 A.2d at 895–896 ("Although the wording of the Pennsylvania Constitution is similar in language to the Fourth Amendment of the United States Constitution, we are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical.").

[30] Opening Br. at 3.

11

inapposite. He also contends that the Delaware Constitution requires that a remedy be provided for such violations regardless of the cost.[31] Because the issue has never been squarely addressed by this Court, the issue is one of first impression.

I first discuss the similarities between the two constitutions in this area of the law. I then point out the significant differences upon which I base my conclusion that the evidence obtained illegally in the home should have been suppressed.

### C. Both Constitutions Recognize that Homes Are Different and Lie at the Core of the Constitutional Protection

The alleged violation here involves a warrantless entry by police into a home. Sanctity of a citizen's home lies at the heart of both the Fourth Amendment and Article I, § 6 of the Delaware Constitution. Both constitutions recognize the importance of one's home in the search and seizure context. In *Cady v. Dombrowski*,[32] the U.S. Supreme Court held that police officers did not violate the Fourth Amendment when they searched the trunk of a car that had been towed after an accident. The Court stated that, "except in certain carefully defined classes of cases," police cannot search private property without consent or a warrant.[33] It stressed that "there is a constitutional difference between houses and cars."[34] Thus, *Cady* created a clear demarcation in the cases "treating automobiles

---

[31] The trial court's separate discussion of the Delaware Constitution is confined to the last sentence in the last footnote of its December 2021 Opinion. *Garnett I*, 2021 WL 6109797, at *7, n.40 ("There is no case law cited by the defense to support a proposition that the Delaware Constitution expands the rights of its citizens in a way that would forbid the application of the inevitable discovery exception in circumstances akin to this matter.").

[32] 413 U.S. 433 (1973).

[33] *Id*. at 439.

[34] *Id*. (quoting *Chambers v. Maroney*, 399 U.S. 42, 52 (1970)).

12

differently from houses" for Fourth Amendment purposes.[35] *Cady's* holding does not apply

to houses.[36] This is so because the Fourth Amendment's "very core" is the right of a person

to retreat into her home and be free from governmental intrusion.[37] As the Supreme Court

has held, "physical entry of the home is the chief evil against which the wording of the

Fourth Amendment is directed."[38] It has also observed that the Fourth Amendment marks

"a firm line at the entrance to a house,"[39] and that "[a]bsent exigent circumstances, that

threshold may not reasonably be crossed without a warrant."[40] This makes sense because

the privacy interests in one's home are greater than in one's car.[41]

The sanctity of the home is deeply embedded in our common law tradition. As the

Supreme Court observed in *Payton v. New York*, "[t]he zealous and frequent repetitions of

the adage that a 'man's house is his castle,' made it abundantly clear that both in England

and the Colonies, 'the freedom of one's house' was one of the most vital elements of

---

[35] *Id*. at 441.

[36] The Supreme Court in *Cady* held that a caretaking search conducted of a vehicle that was neither in the custody nor on the premises of the owner was not unreasonable solely because a warrant had not been obtained. *Id*. at 447–48.

[37] *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018).

[38] *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972).

[39] *Payton v. New York*, 445 U.S. 573, 590 (1980); *see also South Dakota v. Opperman*, 428 U.S. 364, 367 (1976) (holding that a warrantless search of an automobile did not violate the Fourth Amendment but also noted that "warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not.").

[40] *Payton*, 445 U.S. at 590.

[41] *See, e.g., Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (plurality opinion) (observing that "[a] car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view."); *Opperman*, 428 U.S. at 368 ("[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and seldom serves as one's residence or as the repository of personal effects.") (citation omitted).

English liberty."[42] Consistent with this tradition, the U.S. Supreme Court has repeatedly stated that "searches and seizures inside a home without a warrant are presumptively unreasonable."[43]

In *Mason v. State*,[44] Justice Holland, writing for this Court in 1987, detailed the "current state of the law" surrounding the search warrant requirement. His in-depth historical analysis began with the recognition by the Framers of the U.S. Constitution that "[t]he concept of the home as a privileged place, the privacy of which may not be disturbed by unreasonable governmental intrusion, is basic in a free society."[45]

Citing *Payton*, this Court in *Mason* stated that "the history of the constitutional provisions limiting searches and seizures leaves little doubt that searches and seizures are presumptively 'unreasonable' unless they are authorized by warrants, issued upon probable cause, and supported by oath or affirmation before a neutral judicial officer, subject to a few exceptions *justified by absolute necessity*."[46] We observed that "Delaware law is

---

[42] *Payton*, 445 U.S. at 596–97; *see also Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984) ("[B]efore agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries.").

[43] *Kentucky v. King*, 563 U.S. 452, 459 (2011).

[44] 534 A.2d 242 (Del. 1987).

[45] *Id*. at 246. Even before the U.S. Constitution, "[f]undamental limitations on the power of public officials to search, which remain viable today, had been established in the American colonies as early as 1765." *Id*. (citing *Entick v. Carrington*, 19 Howell's State Trials 1029 (1756)). And that limitation was "an extension of a principle of English liberty that 'the house of every one is to him as his castle and fortress, as well as for his defense against injury and violence, as for his repose." *Id*. at 246, n.6 (citing *Semayne's Case*, 5 Coke's Rep. 91a, 91b (1603)).

[46] *Mason*, 534 A.2d at 248 (emphasis added). We then observed that "[o]ne of the recognized exceptions to the search warrant requirement is the doctrine of exigent circumstances." *Id*. (citing *Patrick v. State*, 227 A.2d 486, 489 (Del. 1967)). *See also State v. Lashley*, 803 A.2d 139, 142

14

consistent with *Payton v. New York*," and that "[i]n Delaware, absent exigent circumstances, the police must obtain a search warrant before entering a home at anytime — day or night."[47]

### D. Both Constitutions Recognize the Emergency Exception to the Warrant Requirement But It Does Not Apply Here

Our Delaware courts have recognized several carefully tailored exceptions to the warrant requirement including, for example, searches and seizures incident to a lawful arrest,[48] during a "stop-and-frisk,"[49] and while in hot pursuit of a suspect.[50] Another exception recognized under both constitutions is the Exigent Circumstances Exception.[51] This applies when, considering the totality of the circumstances, an officer reasonably finds

---

(N.J. Super. Ct. App. Div. 2002) ("If we were to uphold the denial of the motion to suppress in this case, the police could decide to enter a home without a warrant, and without both probable cause and exigent circumstances, in order to 'secure' the evidence, whenever they believe they have probable cause to obtain a search warrant.").

[47] *Mason*, 534 A.2d at 248, n.14 (citing Del. Const. art. I, § 6; 11 *Del. C.* §§ 2301, 2308; *Patrick*, 227 A.2d at 489; *Freeman v. State*, 317 A.2d 540, 541–42 (Del. 1974)).

[48] *See Jones*, 745 A.2d at 872 ("A peace officer has the right to seize and search any person whom the officer observes breaking the law. The search is justified as incident to a lawful arrest.").

[49] *See* 11 *Del. C.* § 1902; *Woody v. State*, 765 A.2d 1257, 1262 (Del. 2001) ("Upon careful consideration of the protections afforded Woody under the Fourth Amendment and Article I, § 6 of the Delaware Constitution, and in light of the totality of the circumstances as they appeared to the officers on the evening in question, we conclude that the unique facts of this case justified Woody's detention. In addition, we find the officers had probable cause to arrest Woody after a loaded weapon was discovered on his person pursuant to a properly performed protective pat down.").

[50] 11 *Del. C.* § 2302 ("A search of a person, house, building, conveyance, place or other thing may be made without a warrant if the search is made for a person hotly pursued provided the pursuer has probable cause to believe that such person has committed a felony or a misdemeanor.").

[51] *Mason*, 534 A.2d at 248 ("One of the recognized exceptions to the search warrant requirement is the doctrine of exigent circumstances." (citing *Patrick*, 227 A.2d at 489)).

15

that swift action is required to prevent imminent danger to life.[52]

In this appeal, no party contends that at the time the officers entered the home, there was an emergency that would excuse compliance with the warrant requirement. The trial court, after considering evidence presented at the December 3, 2021 suppression hearing, found that there was no emergency.[53] The court found that "Sergeant Lynch admitted in her testimony that had Patrolman Starke not opened the unsecured back door, she would have left and returned to the home at a later time to try to find the guardian of the children."[54] As the trial court explained:

> [T]he testimony of the officers who conducted the warrantless search was devoid of any indication that the Wawa incident . . . created a sense that the guardian of the children was in danger. Had the officers waited and returned to the home at a later time, as Sergeant Lynch had suggested would have occurred but for Patrolman Starke's action, they would have been armed with additional pertinent information. That information, likely could have turned the situation into a welfare check . . . in addition to the original primary purpose of locating the guardian. Nevertheless, at the time Patrolman Starke breached the 'sanctity' of the home, it was not a welfare check, as the State contended. It was an action by Dover PD to locate the guardian of the three children, not for the guardian's welfare but for the children's welfare.[55]

---

[52] *Patrick*, 227 A.2d at 489 ("It follows that a search warrant is not required to legalize an entry by police for the purpose of bringing emergency aid to an injured person.").

[53] *Garnett I*, 2021 WL 6109797, at *5.

[54] *Id.* at *3.

[55] *Id*. at *4–5; *see also State v. Lashley*, 803 A.2d at 142 ("In light of the judge's undisputed fact-finding about the lack of exigency, we do not believe that the 'inevitable discovery' and 'independent source' doctrines can be utilized to permit admission of evidence found in the apartment.").

16

The court further observed that the children's situation likewise did not constitute an "emergency" as the children were safely in the custody of law enforcement for the time being.

*E. Both Constitutions Recognize the Community Care Exception But Neither Recognizes it in the Context of a Warrantless Entry Into the Home, Absent Exigent Circumstances*

Police can undertake certain actions to check on citizens in distress but entering a home without a warrant, absent an emergency, is not one of them. In *Caniglia v. Strom*, the U.S. Supreme Court held that police officers' community caretaking duties do not justify warrantless searches and seizures in the home.[56] In his opinion, Justice Thomas observed that decades earlier, the U.S. Supreme Court had held in *Cady v. Dombrowksi* that a warrantless search of an impounded vehicle for an unsecured firearm did not violate the Fourth Amendment.[57] Commenting on *Cady*, Justice Thomas observed that "police officers who patrol the 'public highways' are often called to discharge noncriminal 'community caretaking functions,' such as responding to disabled vehicles or investigating accidents."[58] In responding to the question of whether *Cady's* acknowledgement of these "caretaking duties" created a "standalone doctrine that justifies warrantless searches and seizures in the home," the Supreme Court, in *Caniglia*, answered emphatically, "[i]t does not."[59]

---

[56] 141 S. Ct. 1596 (2021).

[57] *Id.* at 1598 (citing *Cady v. Dombrowski*, 413 U.S. 433 (1973)).

[58] *Caniglia*, 141 S. Ct. at 1598.

[59] *Id.*

The Court acknowledged, however, that "the Fourth Amendment does not prohibit all unwelcome intrusions 'on private property,' only 'unreasonable' ones."[60] The Supreme Court then listed the Emergency Exception as one such exception: "law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'"[61] It also acknowledged that officers may generally take actions that any private citizen may take without fear of liability such as approaching a home and knocking on the front door.[62]

However, in declining to extend the Community Caretaking Exception to warrantless entry of homes, the Supreme Court held:

> [T]his recognition that police officers perform many civic tasks in modern society was just that — a recognition that these tasks exist, and not an open-ended license to perform them anywhere. What is reasonable for vehicles is different from what is reasonable for homes. *Cady* acknowledged as much, and this Court has repeatedly "declined to expand the scope of . . . exceptions to the warrant requirement to permit warrantless entry into the home."[63]

In *Caniglia*, petitioner Edward Caniglia retrieved a handgun from his bedroom during an argument with this wife at their Rhode Island home. He put it on the dining room table and asked his wife to "shoot [him] now and get it over with."[64] She declined, left,

---

[60] *Id*. at 1599.

[61] *Id*. (citing *Kentucky v. King*, 563 U.S. 452 (2011)).

[62] *Id*. (citing *Florida v. Jardines*, 569 U.S. 1, 8 (2013)).

[63] *Id*. at 1600 (citing *Collins*, 138 S.Ct. at 1672).

[64] *Id*. at 1598.

and spent the night in a hotel. The next morning when she could not reach him by telephone, she called the police to request a welfare check.

The respondents (who included representatives of the City of Cranston Police Department) accompanied Caniglia's wife to the home where they found him on the front porch. Caniglia confirmed his wife's account of the previous night's events but denied that he was suicidal. Respondents, however, concluded that he posed a risk to himself and others. They called an ambulance and he agreed to go to the hospital for a psychiatric evaluation, but only on the condition that they would not confiscate his firearms. Once the ambulance took Caniglia away, however, the police seized his firearms. Guided by his wife — whom they allegedly misinformed about his wishes — respondents entered the home and seized his firearms.

Caniglia sued, alleging that respondents violated the Fourth Amendment when they entered his home and seized his guns without a warrant. The U.S. Court of Appeals for the First Circuit affirmed the District Court's decision that the officers' decisions to remove Caniglia and his firearms from the premises fell within a "community caretaking exception" to the warrant requirement. In other words, "the First Circuit extrapolated a freestanding community-caretaking exception that applies to both cars and homes."[65] The Supreme Court reversed.

As the U.S. Supreme Court put it, "the First Circuit saw no need to consider whether anyone had consented to respondents' actions; whether these actions were justified by

---

[65] *Id.*

'exigent circumstances'; or whether any state law permitted this kind of mental health intervention."[66]  In rejecting the First Circuit's reasoning and reversing, the U.S. Supreme Court held that "[t]he First Circuit's 'community caretaking' rule, however, goes beyond anything this Court has recognized."[67]  It referred to the "unmistakable distinction between vehicles and homes" and held that "[w]hat is reasonable for vehicles is different from what is reasonable for homes."[68]

Justice Alito, in his separate concurring opinion, described a situation which the Court did not intend to address in *Caniglia*.  That situation concerns warrantless, nonconsensual searches of a home for the purpose of ascertaining whether a resident is in urgent need of medical attention and cannot summon help.  He observed that this is an important concern today given the number of elderly people living alone.  He posited the following scenario which was the basis for a question posed by Chief Justice Roberts during oral argument in *Caniglia*:

> [N]eighbors of an elderly woman call the police and express concern because the woman had agreed to come over for dinner at 6 p.m., but by 8 p.m., had not appeared or called even though she was never late for anything.  The woman had not been seen leaving her home, and she was not answering the

---

[66] *Id*. at 1599.

[67] *Id*.  The First Circuit declined to consider whether any exigent circumstances were present because respondents had forfeited that argument.  Justice Alito pointed out in his concurring opinion that their decision was not intended to call into question features of various state laws that allow for emergency seizures for psychiatric treatment, observation or stabilization, including the categories of persons who may request emergency action, the reasons that could justify the action, the necessity of a judicial proceeding, and the nature of the proceeding.  *Id*. at 1601.  He also noted that the decision was not intended to address so-called "red flag" laws that enable police to seize guns pursuant to a court order to prevent their use for suicide or the infliction of harm on innocent persons.  *Id*.

[68] *Id*. at 1600.

phone. Nor could the neighbors reach her relatives by phone. If the police entered the home without a warrant to see if she needed help, would that violate the Fourth Amendment?[69]

Justice Alito observed that "[o]ur current precedents do not address situations like this."[70] He observed that "[t]his imaginary woman may have regarded her house as her castle, but it is doubtful that she would have wanted it to be the place where she died alone in agony."[71] But he went on to observe that:

> We have held that the police may enter a home without a warrant when there are 'exigent circumstances.' But the circumstances are exigent only when there is not enough time to get a warrant, and warrants are not typically granted for the purpose of checking on a person's medical condition. Perhaps States should institute procedures for the issuance of such warrants, but in the meantime, courts may be required to grapple with the basic Fourth Amendment question of reasonableness.[72]

Justice Kavanaugh, in a separate concurring opinion, emphasized that "the Court's decision does not prevent police officers from taking reasonable steps to assist those who are inside a home and in need of aid."[73] He listed as illustrations: "to prevent a potential suicide or to help an elderly person who has been out of contact and may have fallen and suffered a serious injury."[74] He listed as examples of exigent circumstances that would allow for warrantless entry into a home:

> To fight a fire and investigate its cause; to prevent the imminent destruction of evidence; to engage in hot pursuit of a fleeing felon or prevent the

---

[69] *Id*. at 1601 (Alito, J., concurring).

[70] *Id.* at 1602.

[71] *Id*.

[72] *Id*. (citations omitted).

[73] *Id*. at 1602.

[74] *Id*. at 1603.

21

suspect's escape; to address a threat to the safety of law enforcement officers or the general public; to render emergency assistance to an injured occupant; or to protect an occupant who is threatened with serious injury.[75]

But in our case, no one argues that exigent circumstances or even a medical situation existed when the police entered the home.[76] And the record suggests that there was time to get a warrant. The Exigent Circumstances Exception is "strictly circumscribed,"[77] and it must be "supported by a genuine exigency."[78] It unquestionably does not apply here as the trial court correctly held.

The State relies on our decision in *Williams v. State*,[79] where this Court adopted the Community Caretaker Exception. However, we did not suggest in *Williams* that the doctrine would sanction warrantless entry into a home, absent exigent circumstances. The

---

[75] *Id.*

[76] In its second opinion addressing Garnett's statement, the trial court reiterated its holding that the officers' entry into the home was illegal, and reiterated its findings that "[a]ll officers questioned at the original suppression hearing who were part of the entry indicated that the sole purpose of the home visit was to locate the children's mother, with some additional concern that she was not answering the door after approximately five minutes. *Garnett II*, at *1. It concluded that "the State did not meet its burden to show that the emergency doctrine was applicable." *Id.*

[77] *Georgia v. Randolph*, 547 U.S. 103, 113 n.3 (2006) (citing *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)).

[78] *King*, 563 U.S. at 470. Accordingly, the destruction of evidence must be "imminent" *King*, 563 U.S. at 460, and a "hot pursuit" actually requires "some sort of a chase." *United States v. Santana*, 427 U.S. 38, 42–43 (1976).

[79] 962 A.2d 210, 218 (Del. 2008). Williams involved a police encounter with a citizen walking along a road at night in inclement weather. In *Williams*, we adopted a three-part test for application of the Community Caretaker Exception. In doing so, we observed that although we continue to "acknowledge[] the parameters of the Fourth Amendment as set forth by the Supreme Court, we have declined to follow *Hodari* when enforcing the protection from illegal searches and seizures afforded by the Delaware Constitution." *Id.* at 215.

Delaware Superior Court has expressly held that the doctrine does not apply to a warrantless search of a home.[80]

The U.S. Supreme Court has also held that there is no "murder scene" exception to the Fourth Amendment. In *Mincey v. Arizona*,[81] the U.S. Supreme Court rejected Arizona's "murder scene exception" allowing warrantless searches conducted in the investigation of a homicide, even after the suspects had been apprehended. The Supreme Court observed that:

> [A] warrantless search must be strictly circumscribed by the exigencies which justify its initiation, and it simply cannot be contended that this search was justified by any emergency threatening life or limb. All the persons in Mincey's apartment had been located before the investigating homicide officers arrived there and began the search. And a four-day search that included opening dresser drawers and ripping up carpets can hardly be rationalized in terms of the legitimate concerns that justify an emergency search.
>
> Third, the State points to the vital public interest in the prompt investigation of the extremely serious crime of murder. No one can doubt the importance of this goal. But the public interest in the investigation of other serious crimes is comparable. If the warrantless search of a homicide scene is reasonable, why not the warrantless search of the scene of a rape, a robbery, or a burglary? No consideration relevant to the Fourth Amendment suggests any point of rational limitation of such a doctrine.[82]

Accordingly, the Supreme Court held in *Mincey* that "the 'murder scene exception' created by the Arizona Supreme Court is inconsistent with the Fourth and Fourteenth

---

[80] *See, e.g.*, *State v. Hamilton*, 2017 WL 4570818, at *9 (Del. Super. 2017) (holding that "[t]he [community caretaker] doctrine has never been applied to a warrantless search of a home. Rather, it has been exclusively applied to the seizure of an individual outside the home.").

[81] 437 U.S. 385, 394 (1978).

[82] *Id*. at 393 (citations omitted).

Amendments — that the warrantless search of Mincey's apartment was not constitutionally permissible simply because a homicide had recently occurred there."[83]

Here, when they entered the home, the officers were not investigating a homicide. Rather, they were simply looking for the guardian of the children. At that point, they had no reason to believe that Ms. Hill was injured or that she was in danger. As the Supreme Court observed in *Brigham City, Utah v. Stuart*,[84] the exigency of "emergency aid" required officers to have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.[85] Under *Mincey*, upon discovering the homicide, they were required to obtain a warrant to gather evidence.

Even if one accepted the trial court's observation that "this case is an example of a single officer's negligence and error of judgment regarding the emergency doctrine,"[86] sanctioning the warrantless entry into the home here undercuts a firm and solid line of Delaware precedent construing our Delaware Constitution. The State's argument — that an emergency situation was inevitable — is really tantamount to asking for an expansion of the Emergency and Community Caretaker Exceptions far beyond what has been permitted thus far even under the more permissive Fourth Amendment. Eliminating the "exigency" requirement and undertaking a broad search of the premises without a warrant

---

[83] *Id*. at 395.

[84] 547 U.S. 398, 400 (2006).

[85] *Id*.

[86] *Garnett II*, at *9.

24

upon discovering the murder scene exceeds the bounds of both the Emergency and Caretaking Exceptions.

The touchstone is reasonableness under the circumstances. Although I have no doubt the officers were sincere in their concern for the children and in trying to locate their guardian, there was no emergency.[87] So the Superior Court found, and the State does not contend otherwise on appeal.[88] We should not allow a circumvention of that law here. To do so would permit a highly questionable assertion of the Inevitable Discovery Exception to puncture a huge hole into the heart of a vital constitutional protection.

F. *Nor Does the Independent Source Doctrine Apply Here*

Further narrowing the field of potential avenues for admission of the challenged evidence found at the home, I note that there is a distinction between the Independent Source Doctrine and the Inevitable Discovery Doctrine. The Independent Source Doctrine also does not apply here. Although some courts have used the terms interchangeably, a recent scholarly article explains the distinction:

> Inevitable discovery is a corollary to the independent source exception to the exclusionary rule. Whereas the latter governs evidence that *was in fact* lawfully discovered independent of a constitutional violation, the former governs evidence that *would have been* lawfully discovered if the violation has never occurred. The independent source doctrine requires less

---

[87] *See Commonwealth v. Alexander*, 243 A.3d 177, 190 (Pa. 2020) (the Pennsylvania Supreme Court, observing that "a finding in a case that an officer's warrantless search was not justified by an exigency does not reflect hostility to his or her actions," rather, "[i]t means only that our constitution places greater emphasis on the violations of privacy occasioned by an unreasonable search.").

[88] *Garnett I*, at *4, n.31 (citing *State v. Hamilton*, 2017 WL 4570818, at *9 (Del. Super. 2017) ("The [community caretaker] doctrine has never been applied to a warrantless search of a home. Rather, it has been exclusively applied to the seizure of an individual outside the home."); *Caniglia*, 141 S.Ct. at 1600 (2021).

speculation to implement, as no counterfactual analysis is required. Likely because of its more straightforward application, independent source arose as one of the earliest exceptions to the exclusionary rule, posited by Justice Holmes in *Silverthorne Lumber Co. v. United States* in 1920. Over the following decades, courts adopted and developed the independent source doctrine, paving the way for counterfactual application inherent in inevitable discovery.[89]

The State has cited *Bradley v. State*,[90] where this Court stated that "evidence seized before the police obtain a warrant will not be suppressed if the evidence would have been discovered independently of an initial unlawful search or inevitably would have been discovered through lawful means."[91] However, the order in *Bradley* indicates that we applied a plain error review since a motion to suppress was not filed below. And although we affirmed the Superior Court's admission into evidence items obtained from a warrantless search of a garage, there is no indication that we relied on authorities other than federal authorities such as *Murray v. United States*[92] and *Nix*, or state cases relying solely on the Fourth Amendment.

---

[89] Tonja Jacobi & Elliot Louthen, *The Corrosive Effect of Inevitable Discovery on the Fourth Amendment*, 171 U. of Pa. L. Rev. 1, 6-7 (Dec. 2022) (emphasis in original) (*citing Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920) ("If knowledge of [facts illegally obtained] is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.")); *see also Segura v. United States*, 468 U.S. 796, 805 (1984) (citations omitted) (stating that "it is clear from our prior holdings that 'the exclusionary rule has no application [where] the Government learned of the evidence 'from an independent source.'"); *Norman v. State*, 976 A.2d 843, 859 (Del. 2009) (discussing the federal inevitable discovery exception and independent source doctrine); *State v. Wagoner*, 24 P.3d 306, 308 (N. M. Ct. App. 2001) (clarifying and distinguishing the inevitable discovery exception and independent source doctrine).

[90] 204 A.3d 112, 2019 WL 446548, at *4 (Del. Feb. 4, 2019) (TABLE).

[91] *Id.* at *4.

[92] 487 U.S. 533, 537–39 (1988). The Court in *Bradley* cites *Murray v. United States*, where the Supreme Court stated, "[t]he inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would

In *Murray*, federal agents illegally forced their entry into a warehouse and saw burlap bags in plain view. They left and obtained a search warrant for that warehouse, but without mentioning their prior entry or their observations made during the entry. The agents entered the warehouse pursuant to the warrant and seized the contraband in the burlap bags. A plurality of the U.S. Supreme Court held that the independent source rule is not satisfied "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant."[93]

In the present case, a review of the affidavit submitted with the warrant that was eventually obtained reveals that the illegal entry into 32 Willis Road was the centerpoint of the police's attempt to establish probable cause. Eight of the twenty paragraphs listed in the probable cause section revolve around the officers' illegal entry into the residence.[94]

---

be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." 487 U.S. 533, 539 (1988) (emphasis in original).

[93] 487 U.S. at 542. The Supreme Court vacated the judgment and remanded the case to the Court of Appeals with instructions that it remand to the District Court "for determination whether the warrant authorized search of the warehouse was an independent source of the challenged evidence in the sense we have described." *Id*. at 544.

[94] *See* App. to Opening Br. at A17–18 (Affidavit and Application). The Majority seems to allude the Independent Source Doctrine as well stating:

> [A] search warrant "sought and obtained" *independently* from information learned during the earlier misbegotten entry. This hypothetical search warrant would have been based on *the same facts, as would have justified the emergency entry*, all of which were *unknown to the officers who entered* the Willis Road residence, *but gathered by other officers* around the time of or shortly after the entry. And importantly, *none of those facts would have drawn upon the knowledge gained by the police when they entered the residence* earlier that morning."

Maj. Op. at 19 (emphases added). However, the State has never argued that the Independent Source Doctrine applies and the trial court never considered whether it did. Further, the Independent Source Doctrine does not apply because that doctrine requires no counterfactual

27

Consequently, the warrant cannot serve as an "independent source" due to its use of the tainted evidence obtained from the unconstitutional search of 32 Willis Road to supply the probable cause. As this Court stated in *Jones v. State*:

> [T]he police could not use the illegally seized evidence in the affidavit to support their application for a search warrant. Delaware has not adopted the "good faith" exception to the exclusionary rule and continues to require exclusion of evidence obtained in violation of the Delaware Constitution's protection against illegal searches and seizures.[95]

## G. *The Key Question of the Inevitable Discovery Exception*

With these important precedents in mind, I turn to the main focus — the Inevitable Discovery Exception. The U.S. Supreme Court has offered very little guidance on the application of this exception since its seminal case, *Nix v. Williams*,[96] decided nearly half

---

assumptions as it governs evidence that was *in fact* lawfully discovered independent of a constitutional violation. That did not happen here. As noted above and in *Jones*, the mention of evidence discovered at the house in the warrant negates its independence. Even without mentioning what was discovered at the house, the investigative teams were too intertwined to be considered truly independent. *See, e.g.,* App. to Opening Br. at A123 (Officer Alicia Corrado Testimony on Dec. 3, 2021 at 74:8) [hereinafter "Corrado Test. at [_]"]. ("Once we got back, I was assisting the children inside when Master Corporal Toto left. Because the officers on Willis Road called in that they had an unsecured door to the residence."); *Id*. at A124 (Corrado Test. at 75:3–7 "Q: And how did you get the notification that there was an unsecured door? A: It was the officers on scene sent it over the portable radios which we all carry at which time it came over."); *Id.* at A125–126 (Corrado Test. at 76:23–77:11) ("I intended to use my portable radio to let the officers on scene know what I had found, but was unable to due to them already making a transition on the radio . . . They were already talking on the radio. Q. And what did they say? That they had found an unconscious female on scene.").

[95] 28 A.3d 1046, 1057–58 (Del. 2011) (internal citations omitted); *see also Wagoner*, 24 P.3d at 315 (holding that "Article II, Section 10 of the New Mexico Constitution prohibits us from retroactively and hypothetically correcting the errors of the police at the expense of a defendant's right to be free from an unreasonable search and seizure."); *id.* ("We are persuaded by the reasoning of other state courts which have held that inclusion of illegal information in an application for a search warrant automatically precludes application of the independent source doctrine.").

[96] 467 U.S. 431 (1984).

28

a century ago. In *Nix*, officers were conducting a large-scale search for the body of a

murder victim. Meanwhile, the suspect, Robert Williams, agreed to lead two other

detectives to the deceased victim. Based on Williams' statement, the officers called off the

search. Williams then led the officers to the body. Williams later moved to suppress the

body and related evidence. Notwithstanding that it found a Fifth Amendment violation,

the Court asked whether the body — the same evidence discovered using Williams'

illegally obtained statements — inevitably would have been found regardless of the

violation.

The Supreme Court answered the question by looking at the factual situation before

Williams' illegal interrogation. Specifically, it focused on the intentions of the officers

coordinating the search, the direction the search was moving, its proximity to the body, and

the instructions given to the searchers. Based upon this evidence, the Court concluded that

"the volunteer search teams would have resumed the search had Williams not earlier led

police to the body and the body inevitably would have been found."[97]

Although, as discussed below, some Delaware cases applying federal law follow

*Nix*, they do not answer the question of whether Inevitable Discovery Exception is

compatible with the Delaware Constitution. Clearly, whether the evidence is admissible

could depend on which constitutional provision is being applied.

Although the Majority considers whether the Inevitable Discovery Exception is

incompatible with Article I, § 6 altogether, it is sufficient to focus on the specific question

---

[97] *Id*. at 449–50.

29

presented here, *i.e.*, whether its application to a warrantless entry of a home is consistent with Article I, § 6. I base my conclusion that it is not on four grounds.

First, the development of our law in the search and seizure area, detailed below, including, most tellingly, our rejection of the Good Faith Exception to the Exclusionary Rule, suggests that application of the Inevitable Discovery Exception here is incompatible with Article I, § 6.

Second, in all cases where this Court has applied the Inevitable Discovery Exception, the Court has focused on the U.S. Constitution, as opposed to the Delaware Constitution. This Court has never expressly considered the specific question of whether the Inevitable Discovery Exception can be applied consistently with Article I, § 6.

Third, and relatedly, the parties have sparred over whether this Court's 1977 decision in *Cook v. State*,[98] recognizing the Inevitable Discovery Exception to the Exclusionary Rule, was based on the Fourth Amendment, or Article 1, § 6 or both. I explain why our decision in *Cook* was clearly based on the Fourth Amendment *only* and, as a result, cannot serve either as a controlling precedent or as a basis for concluding that the Inevitable Discovery Exception is consistent with Article I, § 6.

Fourth, a review of other states' cases interpreting similar state constitutional provisions (from both a textual and historical perspective), supports my conclusion that the exception would not be applied to evidence obtained from a warrantless entry into a home by police.

---

[98] 374 A.2d 264 (Del. 1977).

I address each of these reasons for my conclusion in the sections below.

V. *The Inevitable Discovery Exception's Incompatibility with Article I, § 6*

In *Juliano*, we recently reinforced that "[o]ur analysis accepts as settled — under *Jones*, *Dorsey*, and *Mason* — that Article I, § 6 of the Delaware Constitution provides different and broader protections than the Fourth Amendment."[99] I next explain this important trilogy of cases which underpins my analysis.

A. *The Delaware Constitution's Greater Protection than the Fourth Amendment Suggests a Rejection of the Inevitable Discovery Exception Here*

1. *The Delaware Constitution Has a Different Test for Determining Whether a Seizure Has Occurred*

The first relevant area of our elevated Delaware Constitution-based protection concerns the question of when a "seizure" has occurred. As we said in *Jones v. State*, "[a]n individual's right to be free of unlawful searches and seizures in Delaware is secured by two independent, though corelative sources."[100] In *Jones*, we held that the Delaware Constitution adopted a different test regarding when a "seizure" has occurred thereby triggering a person's rights. The issue was at what point during an interaction with police has a person been "seized" and whether the State needed to demonstrate probable cause. Notably, *Jones*, decided in 1999, was the first case in which our Supreme Court considered "whether, and in what situations, Article I, § 6 of the Delaware Constitution should be

_____

[99] *Juliano*, 254 A.3d at 380.

[100] *Jones*, 745 A.2d at 860.

31

interpreted to provide protections that are greater than the rights accorded citizens by the Fourteenth Amendment as it has been interpreted by the United States Supreme Court."[101]

The Supreme Courts of both Delaware and the U.S. agree that a person is "seized" "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of an individual."[102]  For seizures by force, it does not matter if the person is actually stopped — force applied with an intent to restrain completes the seizure.[103]  However, the U.S. Supreme Court in *California v. Hodari D.* reasoned that under the Fourth Amendment, when a police officer attempts to restrain by a *show of authority* — "stop in the name of the law" — the seizure  further requires something more — either physical force or, where that is absent, the subject's "*submission* to the assertion of authority."[104]

When the Delaware Supreme Court addressed the same question in *Jones v. State* a few months after *Hodari D.*, it reached a different conclusion.  Our Delaware Supreme Court held that a seizure could occur by an order by an officer to stop and remove your hands from your pockets.[105]  Specifically, we held that "*Hodari D.* is not consistent with

---

[101] *Id.* at 861.

[102] *Moore v. State*, 997 A.2d 656, 663 (Del. 2010) (citing *Terry v. Ohio*, 392 U.S. 1, n.16 (1968)).

[103] *Torres v. Madrid*, 141 S. Ct. 989, 998 (2021).  Even a "mere touch" can be a seizure, though "the amount of force remains pertinent in assessing the objective intent to restrain," since the test is an objective one which does not involve "prob[ing] the subjective motivations of police officers."  *Id.*

[104] *California v. Hodari D.*, 499 U.S. 621, 626 (1999) (emphasis in original).

[105] As we observed in *Jones*, "*Hodari D.* is binding precedent for this Court insofar as it interprets the Fourth Amendment to the United States Constitution because the almost two hundred year old doctrine of judicial review established the United States Supreme Court as the final arbiter of the United States Constitution."  745 A.2d at 863.

32

our view of when a person is 'seized' within the meaning of Article I, § 6 of the Delaware Constitution in that *Hodari D.* would allow a police officer lacking reasonable suspicion to create that suspicion through an unjustified attempted detention."[106]  The *Jones* Court, therefore, concluded that a seizure occurs when the police officer's actions manifest that "a reasonable person would have believed he or she was not free to ignore the police presence."[107]  Because of that, as soon as the officer ordered Jones to stop and to take his hands out of his pockets, he was seized.  To stop and detain an individual pursuant to the Delaware detention statute and Delaware Constitution, an officer must have reasonable and articulable suspicion of criminal activity.  The information possessed by the officer at the time of the seizure did not rise to that level.  Therefore, the Delaware Supreme Court reversed the judgment and sentence of the Superior Court because the evidence (cocaine) had been invalidly seized from Jones.

Why the two different results (in *Hodari D.* and *Jones*) — particularly if the language of the Fourth Amendment and Article I, § 6 is similar?  In answering that question, we observed that the Delaware Constitution was amended in 1792 after the Fourth Amendment had already been adopted.  In fact, the original search and seizure provision in the Delaware Constitution preceded the adoption of the Fourth Amendment by fifteen years and was originally similar to a provision in the Pennsylvania Constitution.  Delaware continued to follow the search and seizure language from the 1791 Pennsylvania

---

[106] 745 A.2d at 863–64.

[107] *Id*. at 869.

Constitution rather than the language in the Fourth Amendment. The Pennsylvania Supreme Court had determined that the Pennsylvania provision was more expansive than the Fourth Amendment.

In *Jones*, we observed that "the search and seizure provision in the 1792 Delaware Constitution exemplifies that familiarity [with the Constitution of Pennsylvania] because it tracks a similar provision in the 1791 Pennsylvania Constitution."[108] In declining to follow *Hodari D.*, and in deciding to follow Pennsylvania's lead instead, we stated that "the history of search and seizure in Delaware reflects the same commitment to protecting the privacy of its citizens."[109]

Accordingly, we reached the same conclusion as the Pennsylvania Supreme Court with regard to Article I, § 6 "based upon [Article I, § 6's] historical convergence for more than two hundred years with the same provision in the Pennsylvania Constitution."[110] We also noted that the Connecticut Supreme Court had determined that its state constitutional protections exceeded those provided by the Fourth Amendment as interpreted in *Hodari*

---

[108] *Jones*, 745 A.2d at 866.

[109] *Id*. (citing *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), and *Commonwealth v. Matos*, 672 A.2d 769, 776 (Pa. 1996)). In *Edmunds*, the Pennsylvania Supreme Court undertook a comprehensive historical review of the search and seizure provision in the Pennsylvania Constitution. As we observed in *Jones*, "[t]he *Edmunds* Court concluded that the history of that provision reflected *different* and *broader* protections than those guaranteed by the Fourth Amendment." *Jones*, 745 A.2d at 866 (emphasis in original). In 1996, the Pennsylvania Supreme Court in *Matos* concluded that *Hodari D.* was inconsistent with Pennsylvania's Article I, § 8. It reasoned that "the survival of the language now employed in Article I, § 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of the Commonwealth." *Jones*, 745 A.2d at 866 (citing *Matos*, 672 A.2d at 773 (quoting *Edmunds*, 856 A.2d at 897)).

[110] *Jones*, 745 A.2d at 866.

*D*.[111]  Further, we recognized that "these provisions in the Constitutions of Delaware and Connecticut, as well as Pennsylvania, New Jersey and other states tracing their roots to the thirteen original colonies, share venerable origins that precede the adoption of the Fourth Amendment to the United States Constitution."[112]

Importantly, in *Jones*, we distinguished one of our prior opinions (in *Quarles v. State*)[113] that had cited *Hodari D*. with approval.  We pointed out that *Quarles* was consistent with our decision in *Jones* "because in *Quarles the Court used the Fourth Amendment standard* . . . to find that the police had not seized the defendant before the defendant's flight."[114]  Thus, we said in *Jones* quite clearly that a case could be resolved differently depending on which constitution is being construed.

### 2.  *The Delaware Constitution Affords Citizens Greater Protections Regarding Nighttime Search Warrants*

Delaware's more protective stance in the search and seizure area is also demonstrated by its stricter requirements for probable cause for nighttime search warrants. In order to obtain a nighttime search warrant, in addition to probable cause, the Delaware statute requires the judge to be satisfied that it is necessary in order to prevent the escape or removal of the person or thing that is the subject of the search.

---

[111] *Id*. at 867 (citing *State v. Oquendo*, 613 A.2d 1300, 1310 (Conn. 1992)).

[112] *Id*. at 867.

[113] 696 A.2d 1334 (Del. 1997).

[114] *Jones*, 745 A.2d at 868 (emphasis added).

In *Mason v. State*,[115] we explained why even though the Delaware Constitution's requirement of probable cause did exist in that case, there could be no Good Faith Exception to the enhanced statutory requirements for the issuance of a nighttime search warrant. We explained how the history of search and seizure in Delaware differed from the Fourth Amendment. For almost 150 years, a Delaware statute had required *more* than probable cause for the issuance of a nighttime search warrant.[116]

In rejecting the State's argument that the fact that the police acted in good faith should not result in exclusion of the evidence, we held that:

> If this Court were to find a 'good faith exception,' under the circumstances of this case, it would be doing so in a situation where the police did not have exigent circumstances justifying a warrantless entry, failed to allege sufficient facts to satisfy the statutory requirements for a nighttime search of a residence and then failed to receive a search warrant that concluded its nighttime execution was necessary. To render such a decision would not only be an unprecedented break with more than two hundred years of history in this area of the law, but also would be tantamount to a judicial repeal of a specific Delaware statute that for more than one hundred years has set the standards by which applications for nighttime searches of a residence are to be judged by impartial magistrates.[117]

We concluded that there is no good faith exception to the enhanced statutory requirements for the issuance of nighttime search warrants.

---

[115] 534 A.2d 242 (Del. 1987).

[116] In addition to probable cause, a nighttime search warrant requires the affiant to allege that it is "necessary in order to prevent the escape or removal of the person or thing to be searched for." 11 *Del. C.* § 2308.

[117] *Mason*, 534 A.2d at 255. In *State v. White*, the Delaware Superior Court held that an "exigent circumstance" must also exist for the judge to be satisfied that the nighttime search warrant is necessary. 2010 WL 369354 (Del. Super. Feb. 2, 2010).

### 3. *There is No Good Faith Exception to the Exclusionary Rule under the Delaware Constitution*

Perhaps the most relevant heightened Delaware constitutional protection is our Court's explicit rejection of the Good Faith Exception to the Exclusionary Rule. The Exclusionary Rule in Delaware was recognized more than a decade before the federal Exclusionary Rule was extended to state prosecutions, just as the enactment of the search and seizure provisions in the Delaware Declaration of Rights preceded the adoption of the corresponding provisions in the federal Bill of Rights.[118]

In 1984, the U.S. Supreme Court created an exception to the Exclusionary Rule for federal and state police officers who rely on good faith on the existence of a warrant. But over twenty states since then (including Delaware) have refused to embrace the Good Faith Exception under their own state constitutions. That seminal case in 1984 was *United States v. Leon*, where the U.S. Supreme Court created the Good Faith Exception to the warrant requirement.[119] Under the Good Faith Exception, courts may admit evidence obtained by an invalid warrant if the court finds that the officers possessed the reasonable good faith belief that the warrant was valid at the time of its execution.[120]

In *Leon*, the U.S. Supreme Court has characterized its recognition of the federal Exclusionary Rule as a judicially created remedy designed to safeguard Fourth Amendment rights through its deterrent effect, rather than a personal constitutional right of the

---

[118]  Randy J. Holland, *The Delaware State Constitution* 54 (2017); *see also Rickards v. State*, 77 A.2d 199 (Del. 1950).

[119] *United States v. Leon,* 468 U.S. 897 (1984).

[120] *Id.* at 922.

aggrieved party.[121]  The "prime purpose" of the federal Exclusionary Rule is "to deter future unlawful police conduct."[122]  Thus, in *Leon*, the U.S. Supreme Court created the Good Faith Exception to the Exclusionary Rule where police rely on a search warrant which is later held to be invalid for lack of probable cause.[123]

However, many states declined to follow *Leon* on the grounds that it was inconsistent with state constitutional dimensions regarding the enforcement of the Exclusionary Rule.[124]  For example, in declining to follow *Leon*, the Pennsylvania Supreme Court observed that its analogous provision, Article I, § 8, was meant to embody a "strong notion of privacy" carefully safeguarded by that State for the past two centuries.[125]  It reasoned that "the history of Article I, § 8, thus indicates that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the Fourth Amendment, as articulated by the majority in *Leon*."[126]  Ultimately, the Pennsylvania Supreme Court concluded that "given the strong right of privacy which inheres in Article I, § 8, as well as the clear prohibition against the issuance

---

[121] *Id.* at 906.

[122] *United States v. Calandra*, 414 U.S. 338, 347 (1974).

[123] *Id.*, 414 U.S. at 922.

[124] *See, e.g., Edmunds*, 586 A.2d at 888 ("We conclude that a 'good faith' exception to the exclusionary rule would frustrate the guarantees embodied in Article I, Section 8 of the Pennsylvania Constitution.").  Our Court noted in *Dorsey v. State* that Iowa had joined this list of states which included Alaska, Connecticut, Idaho, Michigan, New Hampshire, New Jersey, New Mexico, Nevada, North Carolina, Pennsylvania, and Vermont. *State v. Dorsey*, 761 A.2d 807, 820 (Del. 2000).

[125] *Id.* at 897.

[126] *Id*.

of warrants without probable cause, or based upon defective warrants, the good faith exception to the exclusionary rule would directly clash with those rights of citizens as developed in our Commonwealth over the past 200 years."[127]

In rejecting the Fourth Amendment's Good Faith Exception to the Exclusionary Rule, the Delaware Supreme Court, in *Dorsey v. State*, recognized that the Delaware Constitution embodies the common law principle "that every right, when withheld, must have a remedy, and every injury its proper redress."[128]  We announced that "[w]ithout a constitutional remedy, a Delaware 'constitutional right' is an oxymoron that could unravel the entire fabric of protections in Delaware's two hundred and twenty-five year old Declaration of Rights."[129]

In *Dorsey*, we determined that the warrant to search Dorsey's automobile was issued without probable cause.  We reversed his conviction for Possession of a Firearm by a Person Prohibited.  Since the warrant lacked probable cause, we held that Dorsey's rights under Article I, § 6 of the Delaware Constitution were violated.[130]  We then addressed the remedy.  We started with the premise that "[t]his Court has consistently held that exclusion of evidence is the required remedy for a violation of the Delaware Constitution's protection against searches and seizures without probable cause."[131]  We also observed that it was

---

[127] *Id*. at 901.

[128] *Dorsey*, 761 A.2d at 816–17 (Del. 2000).

[129] *Id*. at 821.

[130] I contrast the situation in *Dorsey* where the police had obtained a warrant prior to the search with the situation here where the police conducted the search knowing that there was no warrant.

[131] *Id.* at 814.

"untenable for the State to argue that the Delaware Constitution must mean exactly the same thing as the United States Constitution."[132]

We observed that Article 25 of Delaware's 1776 Constitution requires that the common law of England "shall remain in force, unless they shall be altered by a future law of the Legislature . . . ."[133]  As for the common law of England, we cited Blackstone's authoritative *Commentaries on the Laws of England:*  "'it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress.'"[134]  We reasoned that it was "logical to infer that by specifically adopting the existing common law of England, the framers of Delaware's first Constitution and Declaration of Rights contemplated that there would be a remedy for the violation of the right to be free from illegal searches and seizures."[135]

Importantly, we stated that "the framers of Delaware's first Declaration of Rights and Constitution did not contemplate excusing violations of the search and seizure right if the police acted in 'good faith.'"[136]  We noted that Article 30 of our 1776 Constitution expressly provided that "[n]o article of the declaration of rights and fundamental rules of this state. . . ought ever to be violated on *any pretence* whatever . . . ."[137]  "Excusing 'good faith' violations of the constitutional right to be free from illegal searches and seizures is

---

[132] *Id*. (citing *Sanders v. State*, 585 A.2d 117, 144 (Del. 1990)).

[133] *Id*. at 816.

[134] *Id*.

[135] *Id*. at 816–17.

[136] *Id*. at 817.

[137] *Id*. (emphasis in original).

exactly the type of 'pretence' that Article 30 in Delaware's 1776 Constitution expressly prohibited."[138] We emphasized our conclusion, reached in *Jones*, that "the history of the search and seizure provisions in the Delaware Constitution reflected *different* and *broader* protections than those guaranteed by the Fourth Amendment."[139]

In *Dorsey*, we continued to drive home the point that "in construing the Delaware Constitution, this Court held that there are state constitutional dimensions to the enforcement of the exclusionary rule."[140] For that point, we relied on our decision from a half a century earlier, in *Rickards v. State*[141] where we rejected the State's argument that the guarantees in Delaware's Constitution against unreasonable searches and seizures did not require illegally obtained evidence to be excluded. We held in *Dorsey* that:

> We conceive it the duty of the courts to protect constitutional guarantees. The most effective way to protect the guarantees against unreasonable search and seizure and compulsory self-incrimination is to exclude from evidence any matter obtained by a violation of them. We believe that as long as the [Delaware] Constitution contains the [search and seizure] guarantees to the citizen referred to, we have no choice but to use every means at our disposal to preserve those guarantees. Since it is obvious that the exclusion of such matters from evidence is the most practical protection, we adopt that means. It is no answer to say that the rule hampers the task of the prosecuting officer. If forced to choose between convenience to the prosecutor and a deprivation of constitutional guarantees to the citizen, we have in fact no choice.[142]

---

[138] *Id*. We observed that Chief Justice Marshall, relying on Blackstone's Commentaries in his opinion in *Marbury v. Madison*, stated that "[t]he government of the United States has been emphatically [been] termed a government of laws, and not men," and that it will "certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Id*. at 821 (citing *Marbury v. Madison*, 5 U.S. 137 (1 Cranch), 163 (1803)).

[139] *Id*. (emphasis in original).

[140] *Id.* at 818.

[141] 77 A.2d 199 (Del. 1950).

[142] Justice Terry and Vice Chancellor Seitz, sitting by designation in *Rickards*, concurred in the Majority opinion. However, Justice Harrington stated in a dissenting opinion that "[w]hen

41

In *Dorsey* we reaffirmed *Rickards* noting that it correctly had "applied that venerable construction [that the violation required exclusion of the illegally seized items] of the Delaware Constitution."[143] Accordingly, in *Dorsey* we held:

> Both before and after *Leon*, in construing the Delaware Constitution, this Court held that there are state constitutional dimensions to the enforcement of the exclusionary rule. We remain convinced that there are constitutional dimensions to the remedy for a violation of the Delaware Constitution's Declaration of Rights. Accordingly, we adhere to our prior holdings in *Rickards* and its progeny, including our most recent holding in *Jones*: exclusion is the constitutional remedy for a violation of the search and seizure protections set forth in Article I, Section 6 of the Delaware Constitution.[144]

Based on that reaffirmation, the evidence from the search of Dorsey's vehicles, performed without probable cause, was suppressed. The same result must obtain here regarding the evidence seized from the illegal, warrantless entry into the home. The Majority's holding violates our time-honored constitutional principle, adhered to through the centuries, that the violation of Article I, § 6 requires a remedy. The Majority ignores *Dorsey* and *Rickards*, and sets a new precedent by providing no remedy for a conceded constitutional violation.

---

pertinent evidence, tending to prove guilt, is before the court, it should not be excluded on the theory that individual rights to constitutional guarantees are superior to the rights of the people of the State to protect from violations of the law." *Rickards*, 77 A.2d at 206; *Dorsey*, 761 A.2d at 818 (citing *Rickards*, 77 A.2d at 205) (internal citations and quotations omitted).

[143] *Dorsey*, 761 A.2d at 820.

[144] *Id*. at 821.

In *Juliano*, we reaffirmed the differing rationales between the federal exclusionary rule and Delaware's exclusionary rule. Focusing on our own "constitutional dimensions" in enforcing the rule, we said:

> To answer this secondary question, the *Dorsey* majority surveyed the history of the exclusionary rule in Delaware, noting that our recognition of the rule in *Rickards v. State* came a decade before the federal exclusionary rule was extended to state prosecutions. The majority also observed that this Court's rationale for applying the exclusionary rule in *Rickards* — that it is incumbent on our courts "to use every means at our disposal to preserve [state constitutional] guarantees," the exclusion of evidence providing "the most practical protection" — differed from the basis for the United States Supreme Court's holding in *Mapp v. Ohio*, which focused on the exclusionary rule's deterrent effect. The majority then pointed to our holding in *Mason v. State* that there is no "good faith" exception to the enhanced statutory requirements for the issuance of nighttime search warrants. This history sufficed to persuade the *Dorsey* majority that "there are constitutional dimensions to the enforcement of the exclusionary rule," which has remained the constitutional remedy — unencumbered by a "good faith" exception — for violation of Article I, § 6's search-and-seizure protections.[145]

This recent statement leaves little doubt in my mind that the evidence from the illegal search of the house must be suppressed under Article I, § 6.

The Majority's assertion — that the Inevitable Discovery Exception is not inconsistent with Article I, § 6's prohibition against unreasonable searches and seizures — is hard to square with our statement in *Juliano* that nowhere is our different constitutional approach (vis-à-vis the U.S. Constitution) more pronounced than in the area of search and seizure law.[146] Nor does *Juliano* support the Majority's adoption of the Inevitable Discovery Exception in this context. First, *Juliano* did not involve a warrantless search of

---

[145] 254 A.3d at 380 (internal citations omitted).

[146] *See infra* n.26.

43

a home or the exclusionary rule. Rather, as we said in *Juliano*, "the step that is in play here, is whether that broader protection [of Article I, § 6] is properly applied to the police conduct — here, pretextual motor vehicle stops . . .."[147] Second, unlike here, where Garnett has focused on the very different rationales for the exclusionary rule under the federal and Delaware Constitutions, we noted in *Juliano* that Juliano has "not offered any reasons why pretextual stops should be treated differently under Article I, § 6 than under the Fourth Amendment."[148] Third, as a result, in *Juliano* we joined the vast majority of states that followed the Fourth Amendment law set forth in *Whren v. United States*,[149] whereas in *Dorsey* we declined to do so noting that at least twenty other states had declined to adopt a "good faith" exception to the exclusionary rule.[150] And fourth, in *Juliano*, we reiterated that the "constitutional dimensions" we had recognized in *Dorsey* require a constitutional remedy.

Instead of providing a remedy, the Majority unwinds this precedent by now simply declaring that the remedy of exclusion is an overly "generous redress." Applying a new cost-benefit analysis (of the type that this Court rejected in *Rickards*, *Dorsey*, and *Mason*),

---

[147] *Juliano*, 254 A.3d at 379.

[148] *Id*. at 386.

[149] 517 U.S. 806 (1996).

[150] The Majority appears to completely disavow *Dorsey* by stating that there can now be a "good faith" exception to the Exclusionary Rule since the officers here were not acting in bad faith when they entered the home. They ignore that a crime scene investigator then walked all through the house taking 40 to 50 photographs knowing that there was no warrant. Instead, they dismissively refer to the conduct as a "benevolent entry."

the Majority now holds that it is perfectly fine to have no remedy for a violation of a core constitutional right — a right that is in the center of the bullseye of Article I, § 6.

### B. The Cook Case Does Not Answer the Question

As noted above, in *Jones*, this Court recognized that we could have different results depending on which Constitution we were construing.[151] It is clear that *Cook* considered only federal law and did not construe Article I, § 6.

For starters, *Cook* is factually distinct from this case. In *Cook*, police responded to a robbery of a supermarket. Employees of the supermarket reported seeing the suspects flee into a wooded area. The police saw three defendants and detained them because they matched the radio descriptions. The police frisked them for weapons. During the frisk, the police recovered money. Cook sought to suppress the evidence from the search by challenging the basis for the frisk and arguing that it exceeded the permitted scope under *Terry v. Ohio*.[152]

In the case presently before this Court, the police were not investigating a particular crime that led them to enter the house. Rather, the police were searching for the guardian

---

[151] *See Jones*, 745 A.2d at 868. There we observed, for example, that:

> Although our opinion in *Quarles* cites *Hodari D.*, the *Quarles* case is consistent with our decision today because in *Quarles* the Court used the Fourth Amendment standard articulated by the United States Supreme Court in *Chesternut* to find that the police had not seized the defendant before the defendant's flight. The *Quarles* decision was based solely on defendant's contention that his Fourth Amendment rights had been violated. In *Quarles* the defendant did not assert a violation of either the statute or the Delaware Constitution both of which were relied upon by Jones in the Superior Court and on this appeal.

*Id.*

[152] 392 U.S. 1 (1968).

of the children.  The location the police searched in *Garnett* is a private residence, whereas in *Cook* the police officer located the suspects emerging from the woods onto a street.  The search in question in *Cook* concerned the scope of a frisk, whereas the search in Garnett was a warrantless search inside a private residence.

In *Cook*, we held that the money would have been inevitably discovered and was admissible.[153]  This was because an inventory search at the police station was the routine procedure.  Notably, the court also found that this was a reasonable frisk in the first place.  The critical point is that nowhere in this Court's opinion in *Cook* did we cite Article I, § 6, and we referenced only cases based upon federal law.  Nor did the briefs from Cook's 1977 appeal filed in our Court cite Article I, § 6.  Rather, they relied on the Fourth Amendment.  Thus, neither the parties, nor this Court, considered a separate argument under the Delaware Constitution in *Cook*.

It is clear that we did not rely on Article I, § 6 in *Cook* because in *Jones v. State*, twenty-two years later, Chief Justice Veasey wrote:  "*This Court has never decided whether, and in what situations, Article I, § 6 of the Delaware Constitution should be interpreted to provide protections that are greater than the rights accorded citizens by the Fourteenth Amendment as it has been interpreted by the United States Supreme Court.*"[154] Thus, *Cook* could not have decided the issue in 1977, if in *Jones* the scope of Article I, § 6 was an issue of first impression in 1999.[155]

---

[153] *Cook*, 374 A.2d at 268.

[154] *Jones*, 745 A.2d at 860–61 (emphasis added).

[155] *See also Dorsey*, 761 A.2d at 815–817.

Moreover, the brief reference to *Cook* in *Jones* suggests that the Inevitable Discovery Exception would not be consistent with Article I, § 6.  In a separate section considering whether Jones' conduct in resisting an illegal arrest could justify admission of the evidence seized, we addressed the State's argument that the crime of resisting even an illegal arrest "caused the application of either the independent source or inevitable discovery exception to the exclusionary rule."[156]  We rejected that argument noting the "significant potential for official abuse."[157]  We stated that "we must consider the situation in a manner that does not nullify important constitutional rights."[158]

Citing to U.S. Supreme Court cases in *Segura*[159] and *Nix*,[160] we observed in *Jones* that the U.S. Supreme Court had found exceptions to the Exclusionary Rule "where the police had an independent source for the evidence untainted by their misconduct and in situations where the police inevitably would have discovered the evidence."[161]  In this brief discussion, which focused solely on Fourth Amendment case law, and citing to our decision in *Cook*, we stated that "[w]e have held that official misconduct should not fatally taint

---

[156] *Jones*, 745 A.2d at 872.  We agreed with the premise that a peace officer has the right to seize and search any person whom the officer observes breaking the law.  The search is justified as incident to a lawful arrest.

[157] *Id.*

[158] *Id.*

[159] 468 U.S. 796 (1984).

[160] 467 U.S. 431 (1984).

[161] *Id.*

47

evidence that would have been discovered absent that official misconduct," and that "[t]he case before us is different, however."[162]

We then emphasized that the purpose of the federal Exclusionary Rule "is to deter future unlawful police conduct."[163] Importantly, we stated that we, however, "*join the many other state supreme courts that have concluded there are state constitutional dimensions to the enforcement of the exclusionary rule*, and specifically find here that those dimensions are correlative to fundamental Delaware state constitutional rights and to preserving the integrity of the judicial system in Delaware."[164] In recognition of those "state constitutional dimensions," we rejected the State's inevitable discovery theory since to accept it would be "to allow an officer, lacking reasonable suspicion to effect a stop or search that leads to an illegal arrest," and then, in bootstrap fashion, "contend that evidence seized incident to that illegal arrest is admissible."[165] Accordingly, we held that "in these circumstances the State may not use as evidence the fruits of a search incident to an illegal arrest."[166]

---

[162] *Id*. at 873.

[163] *Id*. (citations omitted).

[164] *Id.* (emphasis added) (citations omitted) (listing other states that had adopted an independent state constitutional rule barring use of illegally seized evidence).

[165] *Id*.

[166] *Id*.

C. *The Other Delaware Inevitable Discovery Cases Apply Federal Law, Not Article I, § 6, and None Apply it to a Warrantless Entry of a Home*

Although the State argues that "this Court has followed *Cook*'s adoption of the inevitable discovery doctrine for over 40 years," the seven cases it cites all rely on *Cook* or other Fourth Amendment cases. For example, *Roy v. State*,[167] a key Delaware case applying the Inevitable Discovery Exception, we neither considered nor applied Article I, § 6. Instead, we relied on *Cook v. State* as authority[168] in stating that the Inevitable Discovery Exception applies to a *Terry* violation or an illegal arrest.[169] In fact, in a footnote in *Roy*, we stated that "*[s]ince we have concluded that Roy's detention violated the United States Constitution, it is unnecessary to address his argument under the Delaware Constitution.*"[170] As none of the cases that followed *Cook* expressly consider a separate argument under Article I, § 6, they should be understood as cases applying only the Fourth Amendment.[171]

---

[167] 62 A.3d 1183 (Del. 2012).

[168] *Id*. at 1189. We also relied on *Thomas v. State*, 8 A.3d 1195, 1198–99 (Del. 2010) (citing to *Hardin v. State*, 844 A.2d 982 (Del. 2004) and holding the drugs would have been discovered in a search incident to arrest absent consent or compliance with II *Del. C.* § 1902(a)). Like *Roy*, *Thomas* involves a *Terry* stop. Neither *Thomas* nor *Hardin* separately consider Article 1, § 6.

[169] *Roy*, 62 A.3d at 1189.

[170] *Id.* at 1187, n.1 (emphasis added). We concluded that the defendant would have been inevitably discovered during proper police investigation. Roy was the only person near the scene of a reported assault. Had the police not stopped him earlier, they would have continued to monitor him for the few minutes until the murder victim's body was discovered, at which point they would have been justified to detain him and pat him down for weapons.

[171] *See, e.g.*, *Martin v. State*, 433 A.2d 1025, 1031 (Del. 1981) ("This Court approved the inevitable discovery exception in *Cook v. State*."); *DeShields v. State*, 534 A.2d 630, 638 (Del. 1987) (citing to *Martin*, *Cook*, and *Nix*); *Rew v. State*, 622 A.2d 1097, 1993 WL 61705 (Del. Feb. 25, 1993) (TABLE) (citing to *Nix* and stating "This Court adopted the inevitable discovery exception to the exclusionary rule in *Cook v. State*."); *Metelus v. State*, 200 A.3d 227, 2018 WL 6523215 (Del.

As the preceding discussion illustrates, we have looked to other states, including Pennsylvania and New Jersey, in analyzing state constitutional issues. Cases in several of the states with analogous constitutional provisions have rejected a "lock-step" approach with federal Fourth Amendment cases, often emphasizing the state's constitutionally protected privacy interests in the home. Some states have rejected the Inevitable Discovery Exception altogether.[172] Other states have limited its application or have applied heightened burdens of proof in recognition of state-protected interests.[173] Further,

---

Dec. 10, 2018) (TABLE) (citing to *Cook*, *Hardin*, and *Reed v. State*, 89 A.3d 477, 2014 WL 1494098 (Del. Apr. 14, 2014) (TABLE) (No authority cited on Inevitable Discovery Exception)); *Ways v. State*, 199 A.3d 101, 106 (Del. 2018) (citing to *Cook*, *Hardin*, and *Reed*); *Bradley v. State*, 204 A.3d 112 (no discussion of broader Article I, § 6 protections); *Norman v. State*, 976 A.2d at 859 (same). *Harris v. State*, while unpublished, is one of the only cases in Delaware, that discusses the Inevitable Discovery Exception in the context of the home. *Harris v. State*, 947 A.2d 1121, 2008 WL 1809097 (Del. Apr. 22, 2008) (TABLE). *Harris*, along with the cases it cites, makes no mention of Article I, § 6. Further, Harris was on probation when probation officers searched his residence with his landlord's consent. We have recognized that the special nature of probationary supervision justifies a departure from the usual warrant and probable cause requirements for searches. *Id.* at *1. The other case is *Lambert v. State*, 149 A.3d 227 (Del. 2016). There is no citation or mention of Article I, § 6 in the briefs or opinion in *Lambert*.

[172] *See, e.g., Chest v. State*, 922 N.E.2d 621, 625 n.6 (Ind. Ct. App. 2009) (noting that "[u]nder a Fourth Amendment analysis, the likelihood the evidence would have been discovered during the inventory search might support the admission of the evidence under the doctrine of inevitable discovery," but noting, however, that "inevitability has not been adopted as an exception to the exclusionary rule under the Article I, Section 11 of the Indiana Constitution."); *State v. Winterstein*, 220 P.3d 1226, 1232 (Wash. 2009). In *Winterstein*, the Supreme Court of Washington observed that "the federal analysis is at odds with the plain language of article I, section 7, which we have emphasized guarantees privacy rights with no express limitations." *Id.* at 1232. It further held that the "inevitable discovery doctrine is incompatible with article I, section 7 of the Washington State Constitution." *Id.* at 1227.

[173] For example, New York restricts the doctrine's use to secondary evidence. *See People v. Stith*, 506 N.E.2d 911, 913–14 (N.Y. 1987) (observing that "[a]lthough the inevitable discovery rule has for several years been established law in this State, our court has never applied the rule where, as here, the evidence sought to be suppressed is the very evidence obtained in the illegal search.");

intermediate appellate courts in Pennsylvania and New Jersey (discussed below) have recognized that the Inevitable Discovery Exception is inconsistent with state constitutional protections for privacy in the context of warrantless searches in the home.[174]

### 1. Pennsylvania's Constitution Is More Protective of the Home Than the Federal Constitution

As noted above, in *Jones*, we followed Pennsylvania's lead in *Commonwealth v. Edmunds*[175] where the Pennsylvania Supreme Court held that Article I, § 8 of the Pennsylvania Constitution provides broader privacy protections than the Fourth Amendment, and that the purpose of the Exclusionary Rule is not only to deter police misconduct, but to safeguard privacy and only issue warrants upon probable cause. Accordingly, it rejected the Good Faith Exception to the Exclusionary Rule as being incompatible with Article I, § 8.

The seminal case on the Inevitable Discovery Exception in Pennsylvania is *Commonwealth v. Mason*.[176] In *Mason*, decided in 1993, the Pennsylvania Supreme Court

---

*see also State v. Robinson*, 159 A.3d 373, 386–87 (N.J. 2019) (prosecution must "prove inevitable discovery by clear and convincing evidence, a higher standard than that imposed by federal law.").

[174] *See also State v. Ault*, 724 P.2d 545, 552 (Ariz. 1986). In *Ault*, the Supreme Court of Arizona, in construing the Arizona Constitution held:

> Our decision not to extend the inevitable discovery doctrine into a defendant's home in this case is based on a violation of art. 2 § 8 of the Arizona Constitution regardless of the position of the United States Supreme Court would take on this issue. While our constitutional protections were generally intended to incorporate federal protections, they are specific in preserving the sanctity of homes and in creating a right of privacy.

*Id*. at 552; *see also id*. at 549 ("As a matter of Arizona law, officers may not make a warrantless entry into a home in the absence of exigent circumstances or other necessity.").

[175] 586 A.2d 887, 897–99 (Pa. 1991).

[176] 637 A.2d 251 (Pa. 1993).

refused to apply the Inevitable Discovery Exception (and Independent Source Doctrine)[177] because Article I, § 8 of its constitution provides broader protections within the home than the Fourth Amendment. During an undercover sting operation, officers forcefully entered an apartment and secured drug evidence while another officer sought a search warrant. The defendant argued that the entry of her apartment was unconstitutional absent a warrant or exigent circumstances. The state argued that because the warrant application was in process, the Independent Source Doctrine and Inevitable Discovery Exception applied.

The Pennsylvania Supreme Court held the trial court erred in denying Mason's motion to suppress evidence seized in violation of Article I, § 8 of the Pennsylvania Constitution. It recognized that under the Fourth Amendment, it "would be constrained" to agree with the Commonwealth that the evidence should not be suppressed.[178] However, it held that when the police forcibly entered "a dwelling place" without a warrant or exigent circumstances, the state violated Article I, § 8 of the Pennsylvania Constitution, and items

---

[177] The court in *Mason* largely focused on the Independent Source Doctrine, but later cases have cited it favorably in the context of the Inevitable Discovery Exception. *Commonwealth v. Glass*, 754 A.2d 655, 660 n.6 (Pa. 2000) ("*See, e.g.*, *Commonwealth v. Mason*, 535 Pa. 560, 637 A.2d 251 (1993) ("rejecting Fourth Amendment view of independent source and inevitable discovery doctrines in cases involving warrantless entries of private dwellings")); *Commonwealth v. Melendez*, 676 A.2d 226, 230 (Pa. 1996) (Regarding *Mason*, "we discussed both the inevitable discovery rule and its relation to the Pennsylvania Constitution."). The two doctrines appear to be referenced interchangeably in some Pennsylvania cases. *See e.g., Commonwealth v. Melendez*, 676 A.2d at 230 ("The inevitable discovery rule, sometimes referred to as the "independent source rule," is that if the prosecution can demonstrate that the evidence in question was procured from an independent origin, such evidence is admissible.").

[178] *Mason*, 637 A.2d at 254 ("Were the present case to be decided on the basis of Fourth Amendment law, we would be constrained to agree with the Commonwealth that the evidence in the case at bar, like the evidence in *Segura,* should not be suppressed.").

seized pursuant that violation could not be used as evidence.[179] The court recognized not only the objective of deterring police misconduct, but additionally of safeguarding a right to privacy. It stated that "[t]he requirement that warrants shall issue only upon probable cause means nothing if police are free to batter down the doors of persons who imagine themselves to be secure in their own houses."[180] Accordingly, the court held that "where police seize evidence in the absence of a warrant or exigent circumstances by forcibly entering a dwelling place, their act constitutes a violation of Article I, Section 8 of the Pennsylvania Constitution and items seized pursuant to their illegal conduct may not be introduced into evidence in a subsequent criminal prosecution."[181]

In cases following *Mason*, the Pennsylvania Supreme Court has continued to develop and clarify the law as articulated in *Mason*.[182] For example in *Commonwealth v. Melendez*, decided three years later, the Pennsylvania Supreme Court "acknowledged that the independent source rule had been applied in Pennsylvania," but stated that "we

---

[179] *Id.* at 257.

[180] *Id.* at 256.

[181] *Id*. at 257.

[182] *See, e.g., Commonwealth v. Melendez*, 676 A.2d 226 (Pa. 1996) (clarifying *Mason* and holding that warrantless entry of the home was illegal and application of Independent Source Doctrine is proper only in the very limited circumstances where the independent source is truly independent from both the tainted evidence and the police or investigative team that engaged in the misconduct by which the tainted evidence was discovered). In *Melendez*, the Pennsylvania Supreme Court, in applying the rule as clarified, reiterated that "[g]overnment agents may not enter private dwellings through the use of battering rams as in *Mason*, or by effecting illegal stops and seizures as in this case, and secure the premises by detaining those who occupy the premises while police wait to learn whether their application of a warrant has been approved." *Id*. at 335. The court concluded that there was no source of the evidence in question that was truly independent of either the tainted evidence or the police who engaged in the misconduct.

emphasized that its application has been limited."[183] It further observed that its "past cases have made it clear that we place a greater importance on privacy under the Pennsylvania Constitution than have recent federal cases under the United States Constitution," and [it] noted that "the facts in *Mason* were importantly different from the facts in previous independent sources cases in that they involved the invasion of a dwelling place."[184]

Then in 2012, the Pennsylvania Superior Court, sitting *en banc*, applied *Mason* in the context of a dwelling in *Commonwealth v. Berkheimer*.[185] There, state troopers sought to execute a probation detainer late at night. The troopers banged on the door, pushing it open. Smelling marijuana, the troopers entered and saw drug paraphernalia and ammunition. The troopers then applied for a search warrant and found more evidence of marijuana. The trial court denied the suppression motion, finding that the smell of marijuana created probable cause for the issuance of a warrant to search the house, and the evidence inevitably would have been discovered.

However, the *en banc* Superior Court reversed, holding that the troopers' conduct was an invasion of the defendants' privacy interest under Article I, § 8. The Superior Court discussed the "fundamental sanctity of the home as a sanctuary" under both the state and federal constitutional provisions. Citing *Edmunds*, the Superior Court emphasized the purpose of protecting privacy and the strict warrant requirement.

---

[183] 676 A.2d at 333.

[184] *Id.*

[185] 57 A.3d 171 (Pa. Super. Ct. 2012).

The *en banc* court in *Berkheimer* rejected the Commonwealth's assertion of the Inevitable Discovery Exception stating that "[w]e find this use of inevitable discovery inconsistent with our Supreme Court's jurisprudence and violative of the right to privacy espoused in Article I, Section 8 of Pennsylvania's Constitution."[186]  It emphasized that the purpose underlying the exclusionary rule in Pennsylvania "is quite distinct from the purpose underlying the exclusionary rule under the Fourth Amendment."[187]  The court then observed that these guarantees and the role of the exclusionary rule in effecting them "delimits the inevitable discovery exception as a remedy for violation of the warrant requirement under Article I, Section 8," and that "[t]he resulting limitation is significantly more restrictive than its counterpart under federal law."[188]  In *Berkheimer*, the court held that the Commonwealth could avoid suppression only by demonstrating a source truly independent from both the tainted evidence and the police who engaged in the misconduct. But the court found that there was no independent source untainted by the illegal search and, therefore, found that the inevitable discovery exception was not satisfied.

---

[186] 57 A.3d at 181.

[187] *Id*.  The court referred to Article I, § 8's "twin aims" as "the safeguarding of privacy and the fundamental requirement that warrants shall be issued upon probable cause."  *Id*.

[188] *Id*. at 182.  The court in *Berkheimer* distinguished *Commonwealth v. Henderson*, 47 A.3d 797 (Pa. 2012), a case which modified *Melendez* and somewhat relaxed the independent source requirement in a non-dwelling context.  But importantly, it stated that *Mason* and *Melendez* continue to "serve as guideposts" exemplifying that "entry of a private home in the absence of a warrant, on the pretext of circumstances that are not demonstrably exigent, poses a substantial invasion of privacy and may constitute police misconduct."  *Berkheimer*, 57 A.3d. at 188.

Following *Berkheimer*, in *Commonwealth v. Perel*,[189] the Pennsylvania Superior Court considered whether a warrantless search of the defendant's private belongings in closed containers in the bedroom of his girlfriend's apartment fell within the narrow confines of the Inevitable Discovery Exception. The police had probable cause and an opportunity to acquire a warrant. The search was unconstitutional because the police unreasonably relied on the consent of the defendant's girlfriend, when she could not validly consent to a search of the bags because the defendant had a reasonable expectation of privacy in his belongings.

The Pennsylvania Superior Court reiterated that Pennsylvania's "inevitable discovery jurisprudence does not mirror its federal counterpart."[190] It further elaborated that the "inevitable discovery doctrine is not a substitute for the warrant requirement," stating:

> To hold that courts simply may make a post-hoc determination that sufficient probable cause existed at the time of an otherwise illegal search would be to eliminate the key safeguard that delineat[es] the dignity of the individual living in a free society. Such an approach patently is at odds with the strong notions of privacy that are carefully safeguarded by Article I, Section 8 of the Pennsylvania Constitution.[191]

Rather, the State must demonstrate that evidence "would" have been lawfully discovered absent police misconduct, as opposed to arguing that they "could" have lawfully discovered it.[192] Because the state failed to do so, the Superior Court held that the search did not fall

---

[189] 107 A.3d 185 (Pa. Super. Ct. 2014).

[190] *Id.* at 194 (citing *Mason*, 637 A.2d at 256).

[191] *Id*. at 196 (citation omitted); *see also Edmunds*, 586 A.2d at 899.

[192] *Perel*, 107 A.3d at 196.

"within the narrow confines of the inevitable discovery doctrine," and remanded for a new trial without that evidence.

### 2. New Jersey Heightens the Test for the Inevitable Discovery Exception and Narrowly Applies It

The New Jersey Supreme Court has not explicitly addressed the Inevitable Discovery Exception in the context of Article I, ¶ 7 of its constitution. However, the New Jersey Superior Court, Appellate Division has held that the exception as applied to warrantless searches of the home is inconsistent with state constitutional protections.

The New Jersey Supreme Court first articulated a narrow version of the inevitable discovery test in *State v. Sugar*, without clarifying whether it did so under Fourth Amendment or Article I, ¶ 7 jurisprudence.[193] Although, there is no direct citation to the state constitutional provision, the New Jersey Supreme Court, nonetheless, imposed a higher standard of proof and a more stringent "clear and convincing" burden on the State. Under this higher burden, the State would have to show that "had the illegality not occurred, it would have pursued established investigatory procedures that would have

---

[193] The seminal cases on the Inevitable Discovery Exception in New Jersey are part of a three-case series on the Exclusionary Rule: *State v. Sugar*, 417 A.2d 474 (N.J. 1980) (breach of attorney client privilege); *State v. Sugar*, 495 A.2d 90, 103 (N.J. 1985) (creating the New Jersey inevitable discovery rules: "(1) [P]roper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means") [hereinafter "*Sugar II*"]; and *State v. Sugar*, 527 A.2d 1377 (N.J. 1987) (holding the state met its burden under a clear and convincing standard of proof and discovery of a body in a shallow grave was inevitably discoverable because of proximity, obviousness, odor, continued surveillance, and sale of the property).

inevitably resulted in the discovery of the controverted evidence, wholly apart from its unlawful acquisition."[194]

In *State v. Lashley*, a panel of the New Jersey Superior Court considered whether evidence seized from a warrantless entry of a home could be admitted under the Inevitable Discovery Exception under Article I, ¶ 7.[195] After a controlled buy, officers used a steel ram to enter the defendant's apartment to secure it and seized items in plain view before obtaining a search warrant. The warrant application contained descriptions of what the police saw during the warrantless entry. The State cited to the Fourth Amendment Inevitable Discovery Exception and argued that the warrant provided an "independent source" for the search which would have "inevitably" resulted in the seizure.[196] The Superior Court rejected that argument and stated:

> If we were to uphold the denial of the motion to suppress in this case, the police could decide to enter a home without a warrant, and without both probable cause and exigent circumstances, in order to "secure" the evidence, whenever they believe they have probable cause to obtain a search warrant. This rationale is inconsistent with basic principles which flow from our Supreme Court's interpretation of *N.J. Const.* art. I, par. 7, if not the Fourth Amendment, in a State that does not recognize the "good faith" exception to the warrant requirement, and requires both probable cause and exigent circumstances for a warrantless search of an automobile.[197]

---

[194] *Sugar II*, 495 A.2d at 104.

[195] *State v. Lashley*, 803 A.2d 139 (N.J. Super. Ct. App. Div. 2002).

[196] *Id.* at 142.

[197] *Id.* (citations omitted) Although *Lashley* refers to automobile cases which appear to have been abrogated, there is no indication that the holding as to warrantless searches of a home has been called into question.

The New Jersey Superior Court found the warrant invalid under the New Jersey Constitution, because of the warrantless forced entry into a dwelling absent exigent circumstances.[198] In sum, even though the law continues to develop in Pennsylvania and New Jersey, *Mason*, along with the intermediate appellate courts' decisions in those states, suggests that application of the Inevitable Discovery Exception would not be consistent with state constitutional protections in the context of an illegal entry into a home.[199]

---

[198] *Lashley*, 803 A.2d at 143.

[199] I disagree with the Majority's analysis of the cases. Maj. Op. at 40–42 n.105. The Majority cites thirty-one cases (representing twenty-nine states). Twenty-eight of the cases, according to the Majority, recognize the Inevitable Discovery Exception as a matter of state constitutional law. Three reject the exception altogether. A more nuanced analysis of the Majority's lengthy list of citations (beyond "acceptance" or "rejection" of the exception) shows that there are but a few relevant cases that align with their position.

First, courts in Arizona, New Jersey, and Pennsylvania cases have held that the Inevitable Discovery Exception would not be compatible with the relevant state constitutional provisions in situations involving a warrantless search of a home. *See State v. Ault*, 724 P.2d 545, 552 (Ariz. 1986); *Commonwealth v. Mason*, 637 A.2d 251, 254–257 (Pa. 1993). *See also State v. Winterstein*, 220 P.3d 1226, 1233 (Wash. 2009). *Commonwealth v. Berkheimer*, 57 A.3d 171 (Pa. Super. 2012); *Commonwealth v. Perel*, 107 A.3d 185 (Pa. Super. 2014); *State v. Lashley*, 803 A.2d 139 (N.J. Super. Ct. App. Div. 2002); *see also State v. Ellis*, 210 P.3d 144, 155–56 (Mont. 2009) (affirming suppression of evidence observing that "not only was there no attempt to apply for a search warrant, there was no intent to do so[,]"; that "the fundamental purpose — the *raison d'etre* — for the constitutional guarantee against unreasonable searches and seizures is to protect the privacy and security of individuals and to safeguard the sanctity of the home against arbitrary invasions by government officials"; that the police had time to obtain a warrant; that it "bears emphasizing that in Montana 'warrantless searches conducted inside a home are *per se* unreasonable, subject only to a few specifically established and well-delineated exceptions[,]'"; and that "if this Court refuses to scrupulously uphold and enforce the guarantees of the Fourth Amendment and Article II, Sections 10 and 11, then, we can be assured that no other branch of government will."); *State v. Rabon*, 930 A.2d 268, 273–74 (Me. 2007) (where evidence was obtained from an initial warrantless entry of a home, vacating convictions and holding that because probable cause did not exist without information from the initial search, the inevitable discovery exception would not apply and emphasizing that a person's home has "a special place in our jurisprudence.").

Second, rather than focusing on cases involving warrantless searches of homes, the Majority frames the issue in the broadest way, *e.g.*, whether a state has indicated support under its constitution for the exception *in any context*. Eleven of the cited cases do not involve the application of the Inevitable Discovery Exception in the context of a warrantless search of a home.

*People v. Diaz*, 53 P.3d 1171, 1175–76 (Colo. 2002); *Commonwealth v. O'Connor*, 546 N.E.2d 336, 340 (Mass. 1989); *McDonald v. State*, 119 S.W.3d 41, 45, 47 (Ark. 2003); *State v. Ubben*, 938 N.W.2d 722, 2019 WL 3317866 at *3 (Iowa Ct. App. 2019) (TABLE); *State v. Cawley*, 2015 WL 1540683, at *5 (N.J. Super. Ct. App. Div. Apr. 7, 2015) (TABLE); *Tartaglia v. Paine Webber, Inc.*, 794 A.2d 816, 820 (N.J. Super. Ct. App. Div. 2002) (a civil case); *State v. Steele*, 414 P.3d 458, 462 (Or. Ct. App. 2018); *State v. Sinapi*, 295 A.3d 787, 807 n.14 (R.I. 2023); *State v. Stewart*, 867 S.E.2d 33, 37 (S.C. Ct. App. 2021). *See also Hitchcock v. State*, 118 S.W.3d 844, 849 (Tex. App. 2003); *Ammons v. State,* 770 N.E.2d 927, 935 (Ind. Ct. App. 2002). As explained above, these cases are irrelevant because privacy in the home, as a recognized and paramount state constitutional interest, is a factor that distinguishes cases involving homes from other cases.

Others announce that both the Federal and State constitutions protect against warrantless searches of a home, but contain no further distinction or specific indication that the holding as to inevitable discovery is based upon state constitutional grounds. *See, e.g., State v. Thompson*, 155 P.3d 724, 731 (Kan. Ct. App. 2007).

Fourth, at least ten states apply the Inevitable Discovery Exception but do so with a more stringent test. These cases suggest that the Majority's acceptation of a completely unlimited Inevitable Discovery Exception deviates from them. *See Smith v. State*, 948 P.2d 473, 480–81 (Alaska 1997); *State v. Correa*, 264 A.3d 894, 935–36 (Conn. 2021); *Clayton v. State*, 252 So. 3d 827, 830–31 (Fla. Dist. Ct. App. 2018); *State v. Phillips*, 382 P.3d 133, 157 (Haw. 2016); *State v. Wagoner*, 24 P.3d 306, 311 (N.M. Ct. App. 2001); *People v. Saldana*, 906 N.Y.S.2d 775, 2009 WL 4667446, *4 (Watertown City Ct. Dec. 7, 2009) (TABLE); *State v. Holly*, 833 N.W.2d 15, 32 (N.D. 2013); *State v. Barnes*, 96 N.E.3d 969, 975 (Ohio Ct. App. 2017); *State v. Barefield*, 814 S.E.2d 250, 262 (W. Va. 2018). The Majority cites *State v. Little*, 604 S.W.3d 708, 720 (Mo. Ct. App. 2020) (evidence from warrantless entry into the home was admissible where routine police procedure was shown through seeking consent). However, the Missouri Supreme Court applies a more stringent test under the Inevitable Discovery Exception that considers whether alternative investigations were already in process and whether routine procedures were employed. *See State v. Rutter*, 93 S.W.3d 714, 726 (Mo. 2002) (evidence inadmissible under Inevitable Discovery Exception where state presented no evidence of routine procedures while searching closet before warrant was issued). *See also Sugar II*, 495 A.2d at 103.

Finally, only three states' cases involving unconstitutional searches of homes seemingly accept the Inevitable Discovery Exception with no limitations, consistent with the Majority's formulation of the exception. *State v. Garner*, 417 S.E.2d 502, 506, 510–11 (N.C. 1992); *State v. Jackson*, 882 N.W.2d 422, 440 (Wis. 2016); *State v. Robinson*, 164 A.3d 1002, 1007 (N.H. 2017). But *Garner* is distinguishable because the North Carolina Supreme Court held "there is nothing to indicate anywhere in the text of Article I, Section 20 any enlargement or expansion of rights beyond those afforded in the Fourth Amendment as applied to the states by the Fourteenth Amendment." *Id.* at 510. This is completely contrary to our Delaware Constitution's historical departure from the Fourth Amendment. Further, the *Garner* court did not apply the exception to "primary" evidence" seized from the residence (pursuant to a warrant later found to be defective) and suppressed it instead. It only applied the exception to secondary evidence found as a result of routine law enforcement procedures. *Robinson* is also distinguishable as that case admitted evidence pursuant to the Independent Source Doctrine. There, police briefly entered the defendant's apartment without a warrant and observed certain items. They later applied for a warrant. The evidence was

*VI. The Warrantless Entry Into the Home Violated Article I, § 6*

Based upon the analysis set forth above, applying the Inevitable Discovery Exception to allow for the admission of evidence obtained from the warrantless entry of the home violates Article I, § 6. The Majority opinion now opens the door to an erosion of one of our most cherished constitutional rights.

*VII. Application of the Inevitable Discovery Exception Raises Serious Questions Even Under the Federal Constitution*

*A. Reasoning that an Emergency Would Have Later Arisen Eviscerates the Emergency Exception*

Admission of evidence from the home is questionable even under the Fourth Amendment. Relying on cases construing the Fourth Amendment, the State argues that a warrant was not required because the officers eventually would have discovered the body. The trial court reasoned that (i) either the situation would have ripened into an emergency justifying entry under the Emergency Exception or (ii) the mounting evidence would have led to the likelihood of a warrant being applied for and approval.

However, as to the first reason, admitting evidence under the theory that an emergency *eventually* would have been "*inevitable*," would eviscerate the Emergency Exception. This is essentially an end-run around the Emergency Exception.

---

found to have been properly admitted only after a determination that the warrant established probable cause even with references to the tainted evidence excised.

In sum, although the Majority looks far and wide across the nation for support of its position, only one or two cases line up with their position. This diversion is unnecessary in any event as one need not look beyond our Delaware cases (*Jones*, *Dorsey*, *Mason*, and *Rickards)* which control here and support the Dissent's view.

*B. The Problems with Hypothetical Search Warrants Even Under the Fourth Amendment*

The second avenue — that the hypothetical warrant would have been obtained — is an end-run around the warrant requirement and the Exigent Circumstances and Community Caretaking Exceptions.

First, both constitutions require a finding of probable cause. The Inevitable Discovery Exception is not a substitute for getting a warrant based upon probable cause. Here, the police had time to comply with the warrant requirement, but chose to proceed without a warrant.

Second, the notion that police may ignore the search warrant requirement based upon their own determination that probable cause exists flies in the face of both the Fourth Amendment and Article I, § 6 and eliminates the vitally important role of the neutral and detached magistrate. As the U.S. Supreme Court stated in *Johnson v. United States*:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.[200]

---

[200] 333 U.S. 10, 13–14 (1948).

Courts have taken various approaches in addressing the "hypothetical warrant" theory under the Fourth Amendment. For example, in *United States v. Tejada*,[201] Judge Posner, writing for the U.S. Court of Appeals for the Seventh Circuit, identified two extreme approaches and landed on a "middle ground" in dealing with the hypothetical warrant theory of inevitable discovery. The first approach of always applying inevitable discovery "in any case in which the police have probable cause to obtain a warrant" is objectionable. He noted that no court has embraced it because "[t]he obvious objection is that if it were adopted the police might never bother to apply for a warrant, in order to avoid the risk that the application would be denied."[202] The other extreme of only applying inevitable discovery to hypothetical search warrants where the police were in the process of obtaining a warrant "would be equally untenable" as it would confer a windfall on defendants by excluding evidence where there is little need to engage in speculation.[203]

Judge Posner's middle ground is to "require the government, if it wants to use the doctrine of inevitable discovery to excuse its failure to have obtained a search warrant, to prove that a warrant would certainly, and not merely probably, have been issued had it been applied for."[204] He reasoned that "[a] requirement of sureness — of some approach to certainty — preserves the incentive of police to seek warrants where warrants are required

---

[201] 524 F.3d 809 (7th Cir. 2008).

[202] *Id*. at 813.

[203] *Id.*

[204] *Tejada*, 524 F.3d at 813.

without punishing harmless mistakes excessively."[205]

In *Tejada*, the Seventh Circuit affirmed the denial of defendant's motion to suppress where exigent circumstances justified the arrest of the defendant in his home without a warrant. The court ruled that the officers could open the cabinet to the entertainment center as part of the search incident to arrest.[206] They could also search a blue travel bag found in the entertainment center under the Inevitable Discovery Exception. The officers knew the blue bag contained cocaine. But the court held that the agents did not need to unzip a bag found inside the blue bag in order to protect themselves or prevent the destruction of evidence.

Nevertheless, applying the middle ground approach, again, as a matter of Fourth Amendment law, the court found that "inevitable discovery [had] been shown."[207] It reasoned that the police unquestionably were lawfully in the apartment, and were unquestionably entitled to open the cabinet in the entertainment center since the defendant could have made a lunge for the entertainment center. And there in the plain view was the blue bag which they knew contained cocaine as one of the agents had posed as a buyer for the cocaine in a parking lot nearby. The court reasoned that there was not "even the shadow of a doubt that had they applied for a warrant to search the bag, knowing what they knew, the warrant would have been issued."[208]

---

[205] *Id*.

[206] *Id.* The defendant was arrested lawfully even though the arrest took place in his home and the police did not have a warrant due to the exigent circumstances. *Tejada*, 524 A.3d at 811.

[207] *Id.* at 813.

[208] *Id*.

Significantly for our purposes, the Seventh Circuit distinguished those facts from the following scenario where police barge into a home without a warrant:

> The case is remote from one in which the police, having probable cause to search a person's house, barge in and search without benefit of a warrant and defend their conduct by invoking inevitable discovery. If that defense prevailed, the requirement of obtaining a warrant to search a person's home would be out the window. The requirement of obtaining a warrant to search inside a container, when the container is known to contain contraband or other evidence of crime, is far from the core of the Fourth Amendment; as this case illustrates, there is a diminished risk of error or fabrication.[209]

Here, that window, in my view, is now wide open. Although others may view this case as a small encroachment which is justifiable given the facts, it is these "stealthy encroachments" that open the door to a broader deterioration of our cherished rights and fundamental liberties.[210]

### C. Courts Applying the Inevitable Discovery Exception Have Required That Some Steps Be Taken In Applying for the Warrant Before the Search or Seizure or that the Police Were Following a Routine Procedure

Many federal appellate courts that have decided to apply the Inevitable Discovery Exception to a prospective warrant, require that at least some steps to have been taken to obtain the warrant.[211] Here, that was not the case. In *U.S. v. Souza*, the Tenth Circuit stated,

> While the inevitable discovery exception does not apply in situations where the government's only argument is that it had probable cause for the search,

---

[209] *Id*. at 813–14.

[210] *See Coolidge v. New Hampshire*, 403 U.S. at 443, 454 (1971) ("It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.").

[211] *See, e.g., U.S. v. Souza*, 223 F.3d 1197, 1205–06 (10th Cir. 2000).

65

the doctrine may apply where, in addition to the existence of probable cause, the police had taken steps in an attempt to obtain a search warrant.[212]

In citing the test of the Second Circuit in *U.S. v. Cabassa*,[213] the court in *Souza* utilized a four factor test of: (1) how far along in the process of obtaining a warrant officers were; (2) "the strength of the showing of probable cause at the time the search occurred;" (3) "whether a warrant was ultimately obtained, albeit after the illegal entry;" and (4) evidence that officers searched without a warrant because they were worried about whether the warrant would be granted.[214] The officers here did not take any steps to obtain a warrant for the residence prior to the illegal entrance.

The Delaware Superior Court has considered the Inevitable Discovery Exception's application to warrants and, like these federal courts, has distinguished between situations where warrants were in the process of being applied for at the time of the illegal search, and those where warrants were merely prospective.[215] Generally, unless the warrant was

---

[212] *Id.* at 1203.

[213] 62 F.3d 470 (2d Cir. 1995).

[214] *Souza*, 223 F.3d at 1204 (citing *Cabassa*, 62 F.3d at 473, & n.2, 473–74).

[215] *See State v. Preston*, 2016 WL 5903002, at *5 (Del. Super. Sept. 27, 2016) (finding inevitable discovery applied where officers towed a vehicle while a search warrant was in the process of being obtained); *State v. Lambert*, 2015 WL 3897810, at *7 (Del. Super. June 22, 2015), *aff'd*, 149 A.3d 227 (Del. 2016) (distinguishing prospective warrants from ones being applied for at the time of the illegal search); *State v. Harris*, 642 A.2d 1242, 1251 (Del. Super. 1993) (holding testimony from officer saying he "would have obtained search warrant" was not enough for application of inevitable discovery where there was no evidence of a process of preparing a warrant). In *Lambert*, the court discussed that the protection from unreasonable search and seizures stems from statutes, Article I, § 6, and the Fourth Amendment, but did not discuss the broader protections under Article I, § 6 beyond that. *Lambert*, 2015 WL 3897810, at *6. The court then relied on *Cook*, *Martin*, *Hardin*, and *Roy*, which, as noted above, were decided under the Fourth Amendment and not Article I, § 6. It found that "[a]ll the facts supporting the warrant application had already been compiled and submitted to the Justice of the Peace." *Id.* at *7. In fact, there were two pending search warrants. The Superior Court observed that "[t]his case is markedly different than the cases

in the process of being applied for, the Inevitable Discovery Exception did not apply.[216]

The concern is that the application of the doctrine would discourage officers from applying for a warrant, particularly like the situation here where there was ample time to obtain a warrant. The Supreme Court of North Dakota has ruled that the Inevitable Discovery Exception did not apply when an officer testified that he would have applied for a warrant later in the day after the police had earlier relied on a defective warrant.[217] In so ruling, the court stated that "[w]e decline to apply the inevitable–discovery rule in this case because its application would render the warrant protections of the Fourth Amendment meaningless."[218] The court added:

> We have said that the inevitable–discovery doctrine may not be applied to encourage shortcuts by law–enforcement officials which eliminate a neutral and detached magistrate's probable cause determination. Application of the inevitable–discovery doctrine in this case would encourage law–enforcement shortcuts whenever evidence may be more readily obtained by unlawful means – a result at odds with the purpose of the exclusionary rule to deter police from obtaining evidence in an illegal manner.[219]

---

relied upon by the Defendant where police conducted a search without even attempting to obtain a warrant, only to later (1) acquire an after-the-fact warrant as means to justify the earlier search; or (2) argue that if they had in fact applied for a warrant before conducting the search, they would have been granted one." *Id.*

[216] *Lambert*, 2015 WL 3897810 at *7. Notwithstanding these lines of cases, the Majority now says that application of the Inevitable Discovery Exception is not limited to situations where routine police investigatory procedures are in progress.

[217] *State v. Handtmann*, 437 N.W.2d 830, 836, 838 (N.D. 1989).

[218] *Id.* at 838.

[219] *Id.* (citing *State v. Johnson*, 301 N.W.2d 625, 629 (N.D. 1981)).

Therefore, even if we accept the Fourth Amendment's rationale, which is less protective than Article I, § 6, allowing inevitable discovery in warrant cases cuts at the very heart of the Fourth Amendment.[220]

The Sixth Circuit in *U.S. v. Griffin* ruled that intent to apply for a warrant, even in the case where probable cause existed and where a warrant was eventually granted, did not justify application of the Inevitable Discovery Exception.[221]  Although *Griffin* was decided before *Nix*, it provides instructive analysis on the policy rationale underlying the Fourth Amendment.  There, officers went to the defendant's home while other officers went to obtain a search warrant.  The officers had probable cause, but when they got to the home, the warrant had neither been applied for nor granted.  They nonetheless searched the residence.  The search occurred at 5:00 p.m. and the warrant was granted at 9:00 p.m.  In justifying the warrantless search, the officers stated they were worried about disposal of narcotics.  The Court in *Griffin* rejected that excuse:

> We hold that absent any of the narrowly limited exceptions to the search warrant requirement, police who believe they have probable cause to search cannot enter a home without a warrant merely because they plan subsequently to get one.  The assertion by police (after an illegal entry and after finding evidence of crime) that the discovery was 'inevitable' because they planned to get a search warrant and had sent an officer on such a mission, would as a practical matter be beyond judicial review.  Any other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment.[222]

---

[220] *Id.*

[221] 502 F.2d 959, 961 (6th Cir. 1974); *See also U.S. v. Quinney*, 583 F.3d 891, 894–95 (6th Cir. 2009).

[222] *Id.* at 961 (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

The Inevitable Discovery Exception is more often applied in non-home settings, where saturation searches are going on, or where routine or standardized procedures are involved.[223] For example, in *United States v. Bradley*,[224] the Third Circuit recognized that inventory searches of an impounded vehicle "are now a well-defined exception to the warrant requirement of the Fourth Amendment."[225] There, the defendant moved to suppress cocaine that was in a backpack that was in plain view when the trunk of the impounded car was opened. Although the court stated that it "seem[ed] probable that the police would have discovered the cocaine in an inventory search," the Third Circuit, nevertheless, remanded the case because "more information on police procedures — including protocols for the conduct of an inventory search and the scope of an officer's discretion during such a search — is likely needed before making a final determination on inevitable discovery."[226]

In *Martin v. State*, this Court determined that a combination of the possibility of a warrant, a hotel manager saying he would have given permission to search the room, and the fact that the police were conducting a "saturation investigation[,]"[227] was enough for

---

[223] *See Ways*, 199 A.3d at 106 n.13.

[224] 959 F.3d 551 (3d Cir. 2020).

[225] *Id*. at 557 (citation omitted). *But see Commonwealth v. Alexander*, 243 A.3d 177 (Pa. 2020) (holding that warrantless vehicle searches require both probable cause and exigent circumstances under the Pennsylvania Constitution); *State v. Ingram*, 914 N.W.2d 794 (Iowa 2018) (holding that an unconsented-to warrantless search of a bag during an inventory search of a vehicle violated the Iowa Constitution.).

[226] *Id*. at 558.

[227] 433 A.2d 1025, 1032 (Del. 1981) (explaining a "saturation investigation" is where officers "might be expected as a matter of course to make an unusually thorough investigation utilizing more available avenues or techniques than they ordinarily might.") (citing Stephen H. LaCount &

the Inevitable Discovery Exception to apply.[228]  In *Martin*, as in *Nix*, there was specific evidence of the nature of the investigation that police were conducting.[229]  *Martin* relies on *Cook*, which as I have explained, relies on the Fourth Amendment and not on Article I, § 6.  Notwithstanding these lines of cases, the Majority now says that no routine or standardized procedure is required.  Instead, the Inevitable Discovery Exception, according to the Majority, is not so limited.

Garnett argues that "[t]here is no record of any standard operating procedures which, if followed, would have resulted in police entering the home under the emergency doctrine."[230]  The trial court does not explain exactly how the probable cause and nexus requirements would have been met and what crime the police would have been investigating.  The basic point of a warrant is to obtain judicial approval by a neutral magistrate before entry into the home.  In sum, it is highly questionable as to whether the evidence was properly admitted even under the less protective Fourth Amendment.

## VIII.  *Garnett's Confession Was Properly Admitted*

Finally, I would affirm the trial court's denial of Garnett's motion to suppress his confession for three reasons.  First, Garnett was lawfully arrested[231] and was lawfully in

---

Anthony J. Girese, *The "Inevitable Discovery" Rule: An Evolving Exception to the Constitutional Exclusionary Rule*, 40 Alb. L. Rev. 483, 495 (1976)).

[228] *Martin*, 433 A.2d at 1031–32.

[229] *Id*. at 1032.

[230] Opening Br. at 7.

[231] The lawfulness of Garnett's arrest distinguishes the facts before this Court from the case he relies upon, *United States v. Vasquez De Reyes*, 149 F.3d 192 (3d Cir. 1998).  There, the Third Circuit declined to apply the Inevitable Discovery Exception to a statement because the court found that the statement was made as a result of an illegal stop.  *Id.* at 196.

70

custody when he gave the statement. Second, Garnett has not challenged the voluntariness

of his statement.[232] Third, after an evidentiary hearing, the trial court determined that his

statement was not tainted by the illegal search. There is no clear error preventing us from

adopting the trial court's factual findings following the evidentiary hearing.

As to the first point, because the police had probable cause to arrest Garnett at the

Wawa, his arrest was lawful. When officers asked for his name, he gave a name that was

not his and admitted to doing so. As a result, the police lawfully arrested him for criminal

impersonation, and lawfully transported him back to the police station.[233] In addition,

Garnett was under suspicion for grabbing the neck of the child.

As to the second point, the trial judge found that "there was no coercion by the

officers and his statements came of his own free will."[234] The court also found that "Garnett

was advised of his constitutional rights and all *Miranda* procedural safeguards were

---

[232] *See also Lashley*, 803 A.2d at 145. In *Lashley*, the New Jersey Superior Court ruled as follows:

> We find no basis for disturbing the admission of defendant's statements based on his assertion that it was part of a "deal" he made and involuntary. Defendant does not expressly assert that the illegal entry and seizure of evidence (and a reversal of the denial of the motion to suppress) itself affects the voluntariness or admissibility of his statement which was introduced into evidence. However, one of the statements admits prior distribution as well as his activities on October 20, 1998. We do not conclude that the statement is inadmissible, in whole or in part, particularly because there is no challenge to the legality of defendant's arrest. However, we believe that the admissibility of the statements at the retrial and their impact on the convictions for events occurring before October 20, 1998 should be developed before the trial judge after hearing arguments from both parties." (citations omitted)).

*Id.*

[233] Opening Br. at 5.

[234] *Garnett II*, at *3.

71

followed."[235] He "clearly waived such rights"[236] and that finding has not been challenged on appeal. The judge expressly found that no evidence from the search of the home was used during the interview.

As to the third point, there was no taint from the illegal entry of the home. Garnett argues that the interview was delayed because of the search at the home, and that it was tainted by the officers' statement that they went "out to the house." I disagree. The trial court expressly found that the "timing of Garnett's statement would have changed at most minimally, if at all."[237] Although near the beginning of the interview the officers told Garnett they had been out to the house, and that they wanted to know what led to Garnett going to the Wawa with the children, that is all they said about the house. Without any additional details, that statement does not taint the confession that followed.

In fact, Garnett himself was the person who first brought up the body in the house, when he initially denied any involvement in Ms. Hill's injuries. Only when confronted with some of Ms. Hill's diary entries, did Garnett change his story. The officers had legally

---

[235] *Id.*

[236] *Id.* The trial court elaborated on this finding observing that:

> Near the beginning of the interrogation, Garnett quickly indicated to the officers that he wanted to tell them a story. The officers did not lie about any part of the case, and furthermore they did not mention any evidence found at 32 Willis Road, including Ms. Hill's body. There were no threats by the officers during the questioning, and no evidence was presented to this Court that Garnett faced 'extended periods of detention without food.' In addition, there were no promises made by the detectives to Garnett, and no inducements of any kind. Thus, the Court deems the statement voluntary, and that Garnett waived his constitutional rights voluntarily, knowingly, and intelligently.

*Id.*

[237] *Garnett II*, at *6.

obtained the diary which they found in his backpack. The relevant facts, as found by the trial court included the following account:

> As mentioned *supra*, Garnett's statement began at 2:00 p.m. on the same day he was arrested for criminal impersonation. The questioning was conducted by two detectives, Detective Mullaney and Detective Chris Bumgarner. At the beginning, the detectives asked Garnett general questions regarding his identity. Shortly after the beginning of the interrogation, Detective Mullaney stated that he wanted Garnett to tell them what led to his walking to the Wawa with the three children in the early morning hours, and he also told Garnett that officers had been to 32 Willis Road. Garnett responded that he wanted to tell the detectives a "story." He stated that he had come home and had found Ms. Hill's dead body, but that he had played no role in her death and had been shocked by it.
>
> Subsequently, the detectives told Garnett that a journal found on his person following his arrest, which belonged to Ms. Hill, indicated potential trouble with the relationship. Approximately an hour into the interview, Detective Bumgarner pleaded with Garnett "do the right thing." Garnett then admitted that he "did do that shit . . . [that he] lost [his] temper for real . . . [and] [he] got mad and [he] choked her."[238]

The trial court determined that "[n]o evidence from the illegal search was used by the officers to confront Garnett," but that "[t]here was evidence used, *i.e.*, Ms. Hill's journal, that had been lawfully obtained from Garnett's person prior to the illegal search, and in that regard, attenuated from it."[239] Further, "it was Garnett who first disclosed that he was aware of the evidence."[240] Accordingly, the trial court found that "[t]he officers' use of the journal, specifically, its illumination of the relationship issues between Garnett and Ms. Hill, could be deemed a 'precipitating cause' of his admissions."[241]

---

[238] *Id.* at *2.

[239] *Id* at *8.

[240] *Id.*

[241] *Id.*

73

My review of the video of Garnett's statement convinces me that the trial court's determination is correct, *i.e.*, that it was the diary, which was lawfully obtained,[242] which prompted his confession, not the reference to the officers being "out to the house." In other words, it was an act of free will, unaffected by the initial illegality. If the confession was the fruit of anything, it was the fruit of a lawful arrest and the lawfully obtained diary. Therefore, I believe that the statement was admissible.

### IX. Conclusion

In conclusion, I respectfully dissent. I would affirm the denial of the motion to suppress as to Garnett's confession, reverse as to the evidence found in the house, and remand for retrial. As we stated in *Wheeler v. State*:

> [T]he principles laid down in this [O]pinion affect the very essence of constitutional liberty and security. They reach further than the concrete form of the case before the court . . . ; they apply to all invasions on the part of the government and its employe[e]s of the sanctity of a [person's] home and the privacies of life. There is always a temptation in criminal cases to let the end justify the means, but as guardians of the Constitution, we must resist that temptation.[243]

The case before us today is a difficult one. But protection of our Delaware Constitutional rights requires us to look beyond the hard facts of this case, in order that our freedoms and liberties may be preserved for future generations. No matter how much the Majority warns that it is "mindful of the risk" that its opinion could open the door to

---

[242] *Jones*, 745 A.2d at 872 (Del. 1999) (recognizing the search incident to arrest exception, "A peace officer has the right to seize and search any person whom the officer observes breaking the law. The search is justified as incident to a lawful arrest."). The admissibility of the diary has not been challenged.

[243] *Wheeler v. State*, 135 A.3d 282, 307 (Del. 2016) (citation omitted).

encouraging the bypass of important constitutional restraints, I take no comfort in its hope that its opinion will always be read and understood so narrowly. Rather, the Majority opinion should sound alarm bells. The Majority has now declared that evidence may be admitted if obtained when: the police open a door to a home and peer inside (with a flashlight if needed) and look around; they then see something they believe to be illegal (drugs, or a firearm perhaps); and they go inside and gather evidence to use at a trial against the home's occupant. The evidence is then admissible so long as the State can convince the trial court that there was some hypothetical basis upon which the evidence would have eventually been found by the police. Further, the hypothetical basis upon which the evidence eventually would be found need not be the product of a routine or standardized procedure. Nor is it required that another police investigatory procedure be in progress at the time of the illegal entry. Although the result the Majority achieves here may be perceived as a just result given the facts of this case, the precedent it sets for future generations, and its erosion of a fundamental core constitutional right, will outlast this case. Our Court is the last avenue of resort for protection of our state constitutionally-based freedoms and liberties. There is no higher reviewing tribunal that can address an asserted violation of them — not even the United States Supreme Court. The buck stops at our doorstep.